144 A.2d 123 (1958)
CHRYSLER CORPORATION, a corporation of the State of Delaware, Defendant Below, Appellant,
v.
Charles H. QUIMBY, Individually and as Assignee of Randall Motors, Inc., a corporation, Plaintiff Below, Appellee.
Supreme Court of Delaware.
April 30, 1958.
Supplemental Opinion July 11, 1958.
Reargument Denied September 22, 1958.
Aaron Finger and E. N. Carpenter, II (of Richards, Layton & Finger), Wilmington, for appellant.
James R. Morford and Ernest S. Wilson, Jr., Wilmington, for appellees.
SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.
Reargument Denied September 22, 1958. See 144 A.2d 885.
*125 SOUTHERLAND, Chief Justice.
This is a suit for damages for breach of contract founded on promissory estoppel. The plaintiff is Charles H. Quimby, individually and as assignee of Randall Motors, Inc. The defendant is Chrysler Corporation. The case was tried before a jury, which gave Quimby a verdict for $92,200.34. Defendant's motion for a directed verdict in its favor or for a new trial was denied. Chrysler appeals.
*126 In the following statement of facts we shall assume, as we must, that the jury believed Quimby's account of the facts and accepted the inferences from all the testimony most favorable to him.
Upon this assumption, Quimby made the following case:
In 1944 Chrysler and Randall Motors, Inc., entered into a direct dealer agreement granting to Randall Motors the nonexclusive right to sell Chrysler and Plymouth motor vehicles and products within a prescribed area, including the city of Washington and nearby territory. This agreement is sometimes referred to as a "franchise". It was terminable by Chrysler on 90 days' notice.
The president and active executive of Randall Motors was Tom Randall. Quimby, a Washington lawyer, was a friend of Tom Randall for many years. Quimby was secretary and a director of Randall Motors. He often discussed with Tom Randall at lunch the affairs of Randall Motors. He owned 10 shares of the stock.
On January 13, 1951, Tom Randall died. Some days later Charles B. Neely, Chrysler's Regional Manager, asked Quimby for information respecting the stockholders of Randall Motors. Quimby supplied this information. The corporation had outstanding 700 shares of stock. Of these Tom Randall and his wife owned 250; 350 shares were owned by persons in New York; a Mrs. Wynne of Washington owned 90; and Quimby owned 10.
On January 26 Neely reported these facts by letter to J. A. O'Malley, General Sales Manager of Chrysler, at the home office in Detroit. At about this time Quimby had told Neely that he wanted to see Randall Motors continue with the business. Neely wrote to O'Malley that Quimby was making an effort to obtain the business for himself, but he (Neely) would not under any circumstances recommend that he succeed Tom Randall. Neely recommended that a 90-day notice of termination of the agreement be given. O'Malley approved, and the notice was given. It was effective May 13.
On receipt of the notice Quimby at once saw Neely and asked the reason for the termination. He gathered from Neely's reply that it was largely a matter of form; that it was for finding out what would be done with Randall Motors and then making arrangements with the people who would be connected with it.
Thereafter Quimby had several conversations with Neely in the course of which Neely mentioned Mr. O'Malley and Mr. Condon of the Chrysler Office in Detroit. Sometime later (probably early March) Quimby suggested to Neely that it would help straighten out the situation if he (Quimby) went to see Mr. Condon or Mr. O'Malley. Neely told him to go ahead.
Quimby immediately went to Detroit. On arrival he telephoned the Chrysler office. "The only one [he] could contact was Condon". He made an appointment with Condon. Condon was Sales Executive of the Chrysler Sales Division, and on the staff of the General Sales Manager. Quimby told Condon about the business of Randall Motors and his connection with it. Quimby said that he was anxious to keep it going and that since the New York people wanted to get out he would try to acquire their stock. Condon asked: "How about Mrs. Randall?". Quimby said he supposed she would stay in. Condon then told Quimby about some unfortunate experiences Chrysler had had with dealer agreements involving a widow with an interest in the dealer's business and said that Chrysler was not interested in getting into a similar situation again. Quimby asked whether if he got the stock Randall Motors could have the franchise. Condon replied that under no circumstance would Chrysler give the franchise while Mrs. Randall was still a stockholder. Condon also said that if Quimby wanted the franchise continued, he would have to get control of all the stock, and that Mrs. Randall would have to be paid off. Quimby said that he would try. Condon *127 added that the thing for Quimby to do was to go back to Washington and see Neely and "work through him and do whatever he tells you if you want to get the franchise back for Randall Motors. That is the quickest way to do it." But Condon emphasized that Mrs. Randall would have to be paid off completely.
Quimby asked Condon whether the fact that he was a lawyer and wanted to get the controlling interest in the stock would prevent the granting of the contract. Condon replied: "Not at all. You go on back and talk to Mr. Neely."
Condon took him to lunch in the executives' lunch room where he was introduced to various officers around the table as "Mr. Quimby from Randall Motors Company our dealership in Washington". He thought O'Malley was present.
Quimby went to the factory that afternoon on Condon's invitation, and also the next day. He then returned to Washington. He at once went to see Neely at Neely's office. Neely asked him what he (Quimby) had been told. Quimby repeated Condon's statement that he (Quimby) should work through Neely and do whatever Neely told him. Neely said all right, and added that the first thing Quimby must do was to get control of all the outstanding stock; and also said that he must insist on Mrs. Randall being paid off in full. Quimby clearly understood that if he did those two things, Randall Motors would get a renewal of the franchise.
Quimby's statement that he was promised the franchise is corroborated by the testimony of another applicant for it. Mr. D. C. Barnhard went to see Neely around the first of April to apply for the contract. Neely told Barnhard he could make no commitment or even take an application, because "they" had given first refusal to an officer of the Randall Motors Company.
Quimby proceeded to acquire all of the stock of Randall Motors. Sometime around April 10 the New York stockholders sold their 350 shares to Randall Motors for $56,000, or $160 a share. Mrs. Wynne's stock  90 shares  was bought by the corporation for $200 a share. Mrs. Randall gave Quimby a power of attorney to vote her shares, and an option to May 15 to buy her shares at a price to be agreed upon.
About the middle of April Quimby reported to Neely that he either owned or controlled every share of stock of Randall Motors. Neely said that that was fine and he would get in touch with the factory and Quimby would hear from him.
We interrupt our summary of Quimby's case to note that his statement to Neely was inaccurate. He had only an option from Mrs. Randall, and had not obligated himself to buy the stock. The point is of importance, as we develop later.
A few days later Quimby saw Neely again. Neely then told him for the first time that he (Quimby) was a lawyer and not an automobile man; that they wanted an experienced automobile man; that Quimby would have to get someone who would meet with Chrysler's approval as an active manager, and would have to sell that person 51% of the stock.
Quimby was surprised and disappointed. He felt that Neely had broken his promise, but thought that he must meet Chrysler's requirements. Quimby then suggested Walper, Neely's assistant, and asked Neely if he (Neely) would be affected if Walper were to leave him. Neely said no, he thought it would be fine.
Quimby talked to Walper, who was interested. Quimby and Walper talked to Neely, who said he would have to know that Walper himself would own 51% of the stock. He did not say that Walper was unsatisfactory. Walper had preliminary negotiations with a bank for a capital loan on his securities to raise the money required.
Some days later Neely told Quimby that Walper would not be approved at the factory; *128 that Chrysler, from a list of three men, would select one, to whom Quimby must sell 51% of the stock; and that he (Neely) would let Quimby know later whom they had selected. Quimby agreed to this. Neely never told him the name of the person.
Barnhard again saw Neely to inquire how Quimby was progressing with fulfilling the things he had to do. Neely indicated that progress was satisfactory and said that Quimby would have to have an experienced automotive man with him. He also said that he had approved three men, and indicated that Quimby would select one of the three.
On May 9 Quimby bought Mrs. Randall's 250 shares at $240 a share, relying, as he said, on the various assurances Neely had given him. He spent $38,000 of his own funds and borrowed $22,000 from Randall Motors. On the same day he wrote Neely of the purchase and added that he was the sole stockholder. He referred to an arrangement with Walper whereby the latter would acquire a majority of the stock and become an officer of Randall Motors, stated his business experience and formally requested the grant of the franchise.
Some days before this letter Neely had learned from Mrs. Randall that she had decided to accept $240 a share for her stock. On May 7 he wrote O'Malley advising the latter of this fact. He added:
"With Kitty Randall paid off  our moral obligation to Tom Randall is concluded and we are now in position to seek and accept the best possible candidate for our contract."
Neely went on to say that they had quite a few applicants, the most persistent Quimby, with none of whom he was satisfied. Walper and Quimby he thought not qualified. He concluded:
"To sum up the situation, when Randall died we had two problems: first, to replace him with as good or better representation; two, to see to it that his widow and children were treated fairly. The latter we have done. The former we'll proceed to do immediately."
About the end of June or early July Neely told Quimby that he was sorry, but he (Quimby) couldn't have the franchise. On July 3 it was given to the Capitol Garage.
As of June 30 the lease on the property occupied by Randall Motors had one year to run.
Quimby's only subsequent dealings with Neely concerned the matter of Chrysler and Plymouth parts and accessories, which will be considered hereafter.
Sometime in July Quimby obtained a dealer's franchise for Nash automobiles and operated for a year or so under it, but unprofitably. On April 27, 1954, he filed this suit.
Chrysler here assails the verdict against it on five grounds:
I. Quimby took no substantial action on the faith of Neely's promise.
II. Chrysler's agents had no authority to make the promise.
III. The evidence established only a conditional willingness to make an agreement.
IV. The action is barred by the statute of limitations.
V. The court failed to give proper instructions respecting damages:
We take up these points in order.
I. Chrysler's first point is that Quimby took no action of a "definite and substantial character" to invoke the doctrine of promissory estoppel. Restatement of the Law of Contracts § 90.
If the series of negotiations between Quimby and Neely be viewed as a whole, it is apparent that this contention must fail. *129 If his testimony is accepted  and the jury evidently did accept it  Quimby paid out $38,000 for Mrs. Randall's stock at a time when he had been assured that Randall Motors would get the franchise if he stood ready to transfer 51% of the stock to the man named by Chrysler. At that time  May 9  Neely's promise ripened into a binding contract, which Quimby was willing and able to perform. The jury might have concluded that Neely led Quimby on to buy Mrs. Randall's stock under repeated assurances that Randall Motors would get the franchise if Quimby accepted the successive conditions that Neely imposed, never intending, as indicated by his letter of January 26, that Quimby should have it. The jury might also have concluded that Neely's motive in so doing was to obtain for Mrs. Randall, to whom he said Chrysler had a moral obligation, a fair price for her stock. Certainly the evidence justifies such a conclusion.
The promissory estoppel was thus made out. Restatement, Contracts, § 90; Boyer, Promissory Estoppel, 98 U. of P. Law Rev. 459.
But defendant argues that the series of negotiations must not be viewed as a whole; Neely's promise of April 13 was withdrawn before it was acted on by Quimby on May 9. On April 13 Quimby had only an option (and an unenforceable option) to buy; he was not obligated to buy. When Neely told Quimby that Quimby would have to associate in the business an experienced automobile man, says Chrysler, the promise was withdrawn, citing illustration 4 from § 90 of the Restatement.
But Neely's demand could be taken, not as an unqualified withdrawal of his promise, but as merely the imposition of an additional condition. No doubt Quimby could have chosen to treat it as a withdrawal, but he was not bound to do so. In like manner the third demand, that Quimby must transfer to a person named by Chrysler 51% of the stock, could be viewed in the same light. The rule invoked by Chrysler is inapplicable.
Chrysler makes the further contention that the charge of the trial court embodied this very point, and withdrew from the jury's consideration the two subsequent assurances and conditions referred to.
The court charged the jury as follows:
"The first question relates to whether or not Quimby obtained the control of all of the outstanding shares of Randall as contended for by him on or about April 13, 1951. In respect to this question, if you should conclude that he did not obtain the control of all of the outstanding shares as contended for by him on or about April 13, 1951, he would not have performed his obligations under the promise of Neely of March 13th and in such case your verdict would be for the defendant Chrysler.
"On the other hand, if you should conclude from the evidence that he did obtain control of all of the outstanding shares of Randall, including Kitty Randall's on or about April 13, 1951, and so informed Neely of this fact on or about that date, then you should conclude that he had performed his obligations under the March 13th promise by Neely which then ripened into a contract."
Neither side had requested these instructions. They were, in our opinion, insufficient, because they contained no reference to the additional conditions imposed on Neely's promise before Quimby acquired Mrs. Randall's stock, and erroneously referred to the date of April 13 instead of May 9 as the date when the promise ripened into a contract. On April 13 Quimby had only an unenforceable option to acquire Mrs. Randall's stock.
Chrysler, quoting the second instruction, urges that it was clearly erroneous, *130 since the jury could not have found, under the undisputed facts, that Quimby had obtained control of Mrs. Randall's stock on April 13. We agree that this instruction was an error, as was the preceding instruction.
But the point comes too late here. Rule 51 of the Superior Court, Del.C.Ann., relating to instructions to the jury, provides:
"* * * The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objections."
No objection to the quoted instructions was made by either party. Nor did either party ask for an appropriate instruction on the legal effect of the entire negotiations.
Under the explicit terms of the rule Chrysler may not now claim error in respect of the quoted instructions.
II. Chrysler's second point raises the issue of authority. This issue was submitted to the jury and the trial court's instructions upon the issue are not challenged as erroneous. Chrysler's argument is that neither Neely, the Regional Manager, nor Condon, the Sales Executive of the Chrysler Sales Division, had any authority to award a direct dealer's contract; that Quimby knew this, because the 1944 Chrysler contract with Randall Motors carried the signature of the Regional Manager as recommending approval and the signature of the General Sales Manager; and that nothing done by Chrysler could have justified Quimby in believing that in dealing with either Neely or Condon he was dealing with an agent authorized to bind Chrysler by a promise to award a dealer's franchise.
There is no dispute about the applicable legal principles. The question is whether there was any evidence of authority justifying the submission of the issue to the jury. Cerchio v. Mullins, 3 W.W.Harr. 245, 33 Del. 245, 138 A. 277.
It is admitted that neither Neely nor Condon had any actual authority to award the contract. Nor could Neely's position as Regional Manager, considered alone, have led Quimby to believe that he did have such authority. And at the outset of Neely's talks with Quimby, Chrysler had not held out Neely as having such authority. To hold Chrysler Quimby must produce some evidence of Chrysler's manifestation of consent to Quimby that Neely should act as its agent in awarding the franchise. Restatement, Agency, § 68. Hence if Quimby's case rested entirely on his talks with Neely, the question of authority arising from conduct permitted by the principal (often called, perhaps inaccurately, "apparent authority") might well have been one for the court alone.
Quimby, although testifying that approval of the Regional Manager's recommendation is "almost pro forma", admitted that the contract must be approved in the Detroit office.
But Chrysler's argument overlooks the possible inferences that a jury might draw from Quimby's Detroit visit and his conversation with Condon. The background of this conversation must be kept in mind. Quimby was applying for the franchise to the home office of the General Sales Manager  the officer who had full authority to award dealers' contracts. He was dealing with a man who enjoyed the somewhat large-sounding title of Sales Executive and who was on the General Manager's staff. Condon's duties included "assignments" in connection with dealers or dealers' organizations. Quimby might reasonably have believed that he was dealing with a person with some real authority over his application. *131 He had obtained Condon's name from the Regional Manager. It is not unusual for deputies or assistants to the head of a department of a large corporation to possess considerable powers. Certainly Condon's statements about the conditions that Quimby must meet, if he wanted the franchise, were those of someone undertaking in the General Manager's office to speak with authority for Chrysler. The jury might have reasonably found that Quimby had no reason to question that authority. See Bridgeton v. Fidelity & Deposit Co., 88 N.J.L. 645, 96 A. 918, involving a transaction with a corporation's "Contract Department" at the home office; and General Motors Truck Co. v. Texas Supply Co., 4 Cir., 64 F.2d 527.
Condon did not give Quimby the explicit assurance that Quimby wanted; but he told Quimby to work through Neely and to do whatever Neely told him (Quimby) to do if he wanted the franchise.
Chrysler says that this statement to Quimby was a routine referring of Quimby to Washington in accordance with normal procedure. Possibly it may be so regarded, but it is also possible to infer that Condon, having stated conditions of his own, encouraged Quimby to believe that if Quimby complied with Condon's conditions and with such as Neely might prescribe, Randall Motors would get the franchise. At all events such an inference is not manifestly unreasonable.
But this is not all. When Condon told Quimby to go back and work through Neely there was reposing in the files of the General Sales Manager's office Neely's letter of January 26 to O'Malley, stating that under no circumstance would he (Neely) recommend that Quimby receive the franchise. We assume that Condon himself did not know this; but when he undertook to deal with the matter of Quimby's application, he should have known it. When Quimby applied to the General Sales Manager's office he was entitled to be treated fairly. He should have been told at once at the very least that it was very doubtful whether he could get the franchise. Instead, he was in effect encouraged by the home office not only to deal with Neely but to meet whatever conditions Neely prescribed. If his testimony is accepted, Quimby was misled to his injury  unwittingly, no doubt, so far as concerns Condon, but misled nevertheless. In the light of all the circumstances, we think that the issue of authority by estoppel was one for the jury. Since the question before us is essentially factual, we do not pause to analyze all the cases cited to us. Each case turns on its facts. In Brownell v. Tide Water Associated Oil Co., 1 Cir., 121 F.2d 239, relied on by Chrysler, there was no such dealing at the home office as here shown. In Colish v. Brandywine Raceway Association, 10 Terry 493, 49 Del. 493, 119 A.2d 887, the court was dealing with an unusual transaction that it found not to be in the ordinary course of the corporation's business. The situation here is wholly different. There were in 1951 about 3400 Chrysler direct dealer contracts handled by the General Manager's office.
As above stated, there was no error in submitting to the jury the issue of authority.
III. Chrysler's third point is that the evidence established no contract, but merely a conditional willingness to agree to a dealer agreement. Chrysler invokes the principle announced in Universal Products Co. v. Emerson, 6 W.W.Harr. 553, 36 Del. 553, 569, 179 A. 387, 394, 100 A.L.R. 956:
"Where it is clearly understood that the terms of a proposed contract, though tentatively agreed on, shall be reduced to writing and signed before it shall be considered as complete and binding on the parties, there is no final contract until that is done."
This is a sound principle of law; but whether in any particular case involving oral negotiations it is "clearly understood" that the proposed contract is tentative *132 only is a question of intention to be inferred from the evidence. Where the evidence is conflicting and two inferences are possible, as here, the question is for the jury. If the jury believed Quimby's version of the negotiations, an intention to be bound could be inferred. The promise was to execute the standard dealer's contract, and the action is for breach of that promise. Clark v. City of Bradford, 11 Del.Ch. 178, 98 A. 368.
IV. Chrysler contends that the action is barred by the Delaware three-year statute of limitations. 10 Del.C. § 8106. It was brought April 26, 1954, and the breach relied on occurred when Chrysler refused to issue the dealer's contract on the expiration of the old contract, i. e., May 13, 1951. Chrysler contends, however, that a breach of the contract (if one existed) occurred about the middle of April, 1951. This contention is based on Quimby's testimony that he considered that Neely's promise had been broken on or about April 13 when Neely told him that he had to get an experienced automobile man in the business with him.
Much is said in the briefs on the question of determining the time when a contract is breached and the time when the statute begins to run, and the right or duty of the injured party to sue upon an anticipatory breach.
In the view we take of the case, all this discussion is beside the point. There was on April 13, 1951, at the time of the conversation referred to, no contract in existence. Quimby considered that there was, but he was wrong. The promissory estoppel depended on Quimby's taking action to his detriment; and this did not occur until his purchase of Mrs. Randall's stock, as we have already pointed out.
Since the contract sued on did not come into existence until May 9, 1951, the statute of limitations does not apply.
V. Chrysler's final contentions relate to the question of damages.
Quimby claimed three items of damages:
(1) The sum of $60,000 for himself individually, representing damages for loss of his investment in the stock bought from Mrs. Randall;
(2) The sum of $19,000, as assignee of Randall Motors, representing loss of profits for 90 days;
(3) The sum of $33,000 as assignee, representing Randall Motors' loss on the sale of Chrysler and Plymouth parts and accessories.
Item (3) will be first considered, because it is not based upon the promissory estoppel, but upon an alleged breach of the 1944 dealer's contract between Chrysler and Randall Motors.
Paragraph 8 of the 1944 contract provides for the termination of the contract by Chrysler on 90 days' notice, and by the dealer on 15 days' notice. The contract was terminated by Chrysler effective May 13, 1951. Paragraph 8 also provides that upon termination "Chrysler agrees to buy and Direct Dealer agrees to sell within thirty (30) days after the effective date of termination:" certain Chrysler and Plymouth motor vehicles, parts and signs, subject to certain qualifications and conditions. Also, upon termination by Chrysler, Chrysler also agrees to buy "within thirty (30) days after the effective date of termination on written request of Direct Dealer:" certain Chrysler and Plymouth accessories, subject to certain qualifications and conditions.
We are concerned here only with parts and accessories.
As to both parts and accessories the dealer is required, prior to such purchases, to deliver them "FOB Factory" or at any other point designated by Chrysler.
At the time of the expiration of the 1944 contract and of the failure of Chrysler to grant the new franchise, Randall Motors had on hand a very large number of parts and accessories. As of June 30, 1951 the book value of these was $44,399.98.
*133 It is admitted that Randall Motors did not within thirty days after termination of the contract deliver to the factory either parts or accessories, and did not within that period request in writing that Chrysler buy the accessories.
Quimby, however, contended that after the franchise was given to Capitol Garage (July 3) he called Neely and asked him what was to be done about the parts. Neely said he would have DiBrodi (Regional Parts Manager at Philadelphia) communicate with Quimby about it. On July 27 DiBrodi called Quimby. DiBrodi said that before Chrysler would take them back Randall Motors would have to package the parts and ship them to Philadelphia, and also would have to accompany each package with the original invoices. The first condition, Quimby testified, was prohibitive because of expense, and the second impossible of performance. The contract itself does not impose such conditions.
Quimby thereafter attempted to sell the parts and accessories and finally realized from them only about $10,800, resulting in a loss to Randall Motors of about $33,600.
Quimby contended that Chrysler had imposed unwarranted conditions upon the performance of its obligations, and hence had breached the contract. As assignee of Randall Motors he sought to recover from Chrysler his loss on these articles.
DiBrodi denied imposing the additional conditions. Chrysler also contended that as a matter of law Randall Motors' failure to deliver and make written request within the period of thirty days from the expiration of the contract precluded any recovery for loss resulting from the subsequent sale of the parts and accessories, and asked the court so to instruct the jury.
The court submitted to the jury issues arising out of Quimby's contentions, and thus permitted the jury, if it accepted Quimby's testimony, to award damages for Randall Motors' loss.
We think that this was clearly error. At-the time of Quimby's conversation with DiBrodi, Chrysler had been discharged from its obligations under the provisions of Paragraph 8 referred to. The trial court, in its opinion denying a motion for a new trial, referred to DiBrodi's imposition of additional conditions on the purchase of parts and accessories as an anticipatory breach by Chrysler, and Quimby here attempts to justify this holding. This cannot be correct, since the imposition of such conditions occurred after, not during the thirty-day period. There can obviously be no anticipatory breach on July 27 of a clause in a contract that had ceased to be operative on June 13.
Quimby also urges that Chrysler never asked the court to charge on the 30-day period. Chrysler did ask for a charge that no recovery could be had for the loss because Randall Motors had never made any delivery or made any written request. This was sufficient.
It follows that Quimby, as assignee of Randall Motors was entitled to no recovery in respect of losses on parts and accessories, and item (3) must be eliminated from the case.
Items of damage (1) and (2) may be conveniently considered together. Were they properly recoverable, and if so, to what extent?
There appears to be considerable uncertainty in the decisions respecting the correct rule of damages in promissory estoppel cases. The doctrine, at bottom, embodies the fundamental idea of the prevention of injustice. See Restatement, Contracts, § 90; Boyer, Promissory Estoppel, 98 U. of P.Law Rev. 459. Various views have been announced as to the rule of damages.
"Courts have, in fact, done at least four different things about promises which have given rise to unbargained-for reliance: (1) nothing, (2) granted restitution, (3) reimbursed the promisee's losses through reliance, (4) secured for the promisee the expectancy *134 or its value. All these possibilities are recognized in the Restatement except the third. Section 90 itself leaves the court a discretion to refuse relief altogether. Section 347(1) (b) provides for a restitution of benefits." Fuller and Perdue, "The Reliance Interest in Contract Damages", 46 Yale L.J., 373, 405.
Under the facts of this case we think that Quimby was entitled first, to be made whole in respect of his investment of $38,000 in Mrs. Randall's stock, and second (as assignee), to recover Randall Motors' expectancy in respect of profits that might reasonably have been expected during a period of 90 days, at the end of which the contract was terminable by Chrysler. With respect to net profits there was evidence to support the claim in the net earnings of Randall Motors for the three months of February, March and April.
Chrysler cites Goodman v. Dicker, 83 U. S.App.D.C. 353, 169 F.2d 684, in which expected profits were eliminated from a recovery of damages in a promissory estoppel case. This seems to us to be an unjustifiable restriction as applied to the facts before us. Loss of three months' profits is a direct result of the breach.
Chrysler argues that Chrysler's promise, on which Quimby relied, was made to Quimby, not to Randall Motors. It is clear that Quimby negotiated on behalf of Randall Motors, which, as the court below held, was to be regarded as a beneficiary of the contract. Both Quimby and Randall Motors suffered loss from the breach.
Chrysler finally urges that there could be no recovery of such profits because under the dealer's contract Chrysler was under no obligation to deliver motor vehicles on the dealer's order. The contract provides:
"All orders are subject to approval and acceptance by Chrysler at its principal place of business."
This provision must be read in the light of the 90-day termination clause and reconciled with that clause. So construed, it is merely a clause enabling Chrysler to refuse delivery for reasonable cause. To construe it as Chrysler now contends would result in making the agreement one terminable at will and thus rendering the 90-day termination clause meaningless. The contract is by its terms governed by Michigan law. Our conclusion finds support in the decision of the Supreme Court of Michigan in J. R. Watkins Co. v. Rich, 254 Mich. 82, 235 N.W. 845, to the effect that the right of termination must be exercised in good faith. The case of F. H. McClintock Co. v. Truxell Sales & Service, 297 Mich. 284, 297 N.W. 493, cited by Chrysler, is not in point. It was a contract between a direct dealer and a retail dealer engaged in selling and servicing automobiles. It contained a clause specifically exonerating the direct dealer from any damage for failure to ship cars.
We find no error in respect of the claim to recover expected net profits for the 90-day period.
Item of damage (2) is based on a claim that Chrysler's refusal to award Randall Motors the dealer's contract rendered Quimby's stock worthless.
The court charged the jury as follows:
"If your verdict should be for the plaintiff, Quimby, his measure of damages in his own right would be the difference between the amount that you should find that Quimby paid to Mrs. Randall for the 250 shares of Randall representing stock owned by her, together with that owned by the estate of Tom Randall on May 9th and the value of those shares immediately after the breach of the contract on May 13, 1951. On the other hand if you should conclude that Quimby suffered no loss by reason of purchasing the shares aforesaid then Quimby could not be entitled to any damages in this respect."
*135 As a general statement of the measure of damages in respect of the loss resulting from the purchase of the 250 shares, this instruction was correct, although we think it would have been preferable to specify Quimby's outlay as $38,000. (We deal with this point later.)
But, as we shall show, the error, in permitting the recovery of loss on parts and accessories entered into the claim for loss in respect of the stock.
Since the case must go back for a new trial, we should, for the guidance of the trial judge, examine the evidence offered to support Quimby's claim, that is, to show the value of the shares on May 13, and indicate our views on its admissibility.
How is that value to be determined?
Since there is no evidence that the shares had any market value, and since their earning power after the termination of the franchise was highly uncertain, asset value would be the basis for determining their worth. In determining such value it was proper to consider that the corporation no longer had a going business. Quimby adopted this approach. He claimed that on May 13 the stock was worthless  that the corporation was "under water", and that if he had liquidated it he would have recovered nothing. He arrived at this conclusion on the basis of the June 30 balance sheet. (The May 31 balance sheet would seem to be a more appropriate one to use, but we shall take the June 30 statement.)
The June balance sheet showed net assets of about $113,000. From this should be eliminated a $20,000 loan to Quimby, since as sole stockholder it was of no value to him in realizing on the assets. From the balance of $93,000 Quimby eliminated or reduced seven items totalling about $66,000, and added a contingent liability of $30,000 (not carried on the balance sheet) representing one year's rent due under the existing lease. This left a net deficit of about $3,000.
As to the addition to liabilities of the $30,000, it seems an appropriate charge in evaluating the worth of the realizable assets, since on liquidation the corporation would have remained liable for this rent. Chrysler, of course, was entitled to show, if it could, that there was a market for the assignment of the lease, or for sub-letting.
But the figure of $66,000 included a loss of $33,600 in respect of parts and accessories. The deduction of this item was clearly erroneous. Not only would its allowance have resulted in double damages, since Randall Motors had an independent claim with respect to it, but also it was on May 13, the date of the breach, a recoverable asset, less expenses of transportation and any other possible deductions. As we have shown, Quimby simply failed to take steps to recover it. It must therefore be restored to the asset side of the balance sheet. (Quimby is, of course, at liberty to adduce any evidence tending to show that the book value should be reduced.) The realizable assets were accordingly, under Quimby's own testimony, about $30,600. Quimby's loss, therefore, would (using these figures) be limited to the difference between $38,000 and 25/26 of $30,600, or about $8500. (He already owned 10 shares.) This gives effect to Quimby's remaining six eliminations or deductions, which, on the face of his testimony, seem proper, although manifestly most of them were only estimates, and might be challenged.
We have examined the point at some length, first, because of the error in respect of the claim relating to parts and accessories, and second, because we wish to give the court below, on retrial, such help as we can upon the admissibility of the evidence respecting asset value. We do not of course suggest that the computations we have made are to be used at the trial. They illustrate what we think is the correct method of computing these damages. It will be for the jury to determine, upon all the evidence before them, whether Quimby *136 suffered any loss of value in the 250 shares, and if so the amount.
If the case comes on again for trial, the jury should be charged, with respect to Quimby's claim for loss of value of his shares, that the measure of damages is the difference between $38,000 and any lesser amount representing 25/26 of the realizable value of the assets of Randall Motors on May 13.
A word must be said about counsel's claim that Quimby's investment was $60,000, not $38,000, because he paid that amount to Mrs. Randall.
Of the total price $22,000 was borrowed from Randall Motors. If this debt had represented an obligation to a third person, there would be basis for the claim. But upon the acquisition of Mrs. Randall's stock Quimby became the sole stockholder of Randall Motors and owed the money (in effect) to himself. The situation, for the present purpose (Quimby's loss), is exactly as if the $22,000 had been charged to surplus, as in the case of the purchase of the New York stock. At the trial Quimby claimed a $74,000 loss to the corporation from those purchases, but the trial court rejected the claim, and we think properly.
Quimby's expenditure in reliance on the promise was $38,000, plus (if claimed) any possible out-of-pocket expenses incident to the various purchases of stock.
The foregoing discussion and conclusion make it unnecessary to discuss Chrysler's contention that the trial court erred in refusing a charge on double damages, or the contention that Quimby's losses from his operation of the Nash agency might have entered into the verdict.
It follows from the foregoing discussion that the verdict of the jury in respect of damages cannot be upheld.
There remains the question: what proceedings should be taken on remand? Should an unlimited new trial be granted, or has this Court inherent authority, in its discretion, to limit the retrial to the issue of damages, and if so should the retrial in this case be so limited?
This is, so far as we know, a novel point in this State. Naturally enough, it is not discussed in the briefs. We therefore desire to give counsel an opportunity to exchange and submit to the Court, within fifteen days, supplemental memoranda on the point. In the meantime, the time allowed for filing petitions for re-argument will be extended until ten days after the Court shall have filed a supplemental opinion in the cause.

Supplemental Opinion
In our opinion filed in this case April 30 1958, we held that the verdict for plaintiff must be set aside and a new trial ordered because of the error in respect of the instructions to the jury relating to the issue of damages. We invited counsel to submit additional briefs on the question of whether this Court has the right to limit the retrial to the issue of damages, and if so, whether the retrial in the case should be so limited.
As to the first question, we entertain no doubt of the power of this Court to order a partial retrial in a proper case. Whatever may have been the old rule with respect to the indivisibility of judgments at law, the modern rule is well-settled that a new trial may be had upon limited issues when such issues are severable from the other issues, and no injustice will result from retaining the verdict upon those other issues. 39 Am.Jur. "New Trial", § 21; 5B C.J.S. Appeal and Error §§ 1915-1918; 98 A.L.R. 941, annotation; 29 A.L.R.2d 1199, annotation.
A large number of cases dealing with the subject of retrial upon the issues of damages alone have been examined. They fully sustain the right to reverse for retrial on limited issues. Many of the decisions are based on statutes, but many rest upon the inherent right of the appellate court to *137 prescribe the extent of the proceedings below. See the discussion of the point in Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, and the exhaustive annotation to that case in 75 L.Ed 1191ff. In Simmons v. Fish, 210 Mass. 563, 97 N.E. 102, 104, Ann.Cas.1912D, 588, the Supreme Court of Massachusetts reviewed the decisions in that commonwealth, and concluded that from early times the power to limit issues on a retrial had been exercised by that Court as part of its inherent power. The Court said:
"The guiding principle is that, although a verdict ought not to stand which is tainted with illegality, there ought to be but one fair trial upon any issue, and that parties ought not to be compelled to try anew a question once disposed of by a decision against which no illegality can be shown. Thus the parties and the commonwealth have been saved the expense, annoyance and delay of a retrial of issues once settled by a trial as to which no reversible error appears."
This decision is in conformity with the great weight of authority in this country. See the annotations above cited.
Defendant, invoking the English common law rule that a judgment must be treated as indivisible, cites Campbell v. Brandenburger, 5 W.W.Harr. 203, 35 Del. 203, 162 A. 354, in which the Superior Court referred to a partial new trial as "unknown to our practice." Since that decision the new rules of civil procedure have been adopted. Rule 59(a) expressly permits a retrial on "part of the issues." In effect the Campbell case has been overruled.
The second question is whether a partial retrial should be ordered here.
The application of the rule permitting partial retrials is by no means automatic. It is applied in the interest of justice. Two conditions must be met:
1. The issue to be retried must be clearly severable from the other issues;
2. It must appear that no injustice will result from limiting the issue on retrial.

1. The Question of Severability.

The instant case concerns the issue of damages. This appears to be the issue in which a limited retrial is most frequently granted. This is a suit for breach of contract. From the facts set forth in our first opinion, it is entirely clear that the issue of the measure and amount of damages is in no respect interwoven with the issue of liability. This is so, because once the breach  the refusal to renew the license agreement  is established, the measure of damages is fixed by law, and is unrelated to the circumstances respecting the formation of the contract or the circumstances of the breach. Moreover, the measure and the amount of damages are the same, whether the contract became effective in April (the date adopted by the trial court) or in May (the date adopted by this Court). The date of the breach is fixed  May 13, 1951, when Chrysler failed to renew the license agreement. This distinguishes the case at bar from the Gasoline Products case, supra, in which the court found that the jury's verdict left uncertain, among other things, the date of the breach.
Chrysler suggests that Quimby's compliance with the additional condition that he sell 51% of his stock would affect the amount of his recovery. This suggestion we cannot understand. Quimby did not sell his stock; he never had the opportunity to do so, because Chrysler never approved or designated the purchaser.
Chrysler also argues that the amount of the verdict suggests the application of the policy of the courts to grant a full new trial in cases of grossly excessive damages. Wax v. Altshuler, 22 N.J.Super. 229, 91 A.2d 768, 771. In that case the court held that the "emotionalism which caused the jury to err in regards to damages also influenced them in their determination of the issue of liability." No such case is *138 presented here. The amount of the verdict  some $92,000  could well be based on the evidence that the court permitted the jury to consider. It was some $50,000 less than Quimby asked for.

2. The Issue of Injustice.

The main thrust of Chrysler's memorandum is directed to the contention that to grant a partial retrial in this case would be unjust to Chrysler. It is earnestly contended that the case below was tried solely upon the theory that Quimby's claim was limited to a contract growing out of conversations in March, 1951; that the case was submitted to the jury on this theory alone; that because of the erroneous instruction of the court the jury never fairly resolved in plaintiff's favor the existence of a contract based on the subsequent conversations; and that Chrysler is entitled to have the jury re-find the terms of the contract. 6 Moore's Federal Practice, 3762.
To buttress this argument Chrysler attempts to treat the case as involving two contracts  one claimed by plaintiff to exist, and another found by this Court to exist. The March conversations are referred to as "the March contract", and the May 9 purchase of Mrs. Randall's stock on the basis of the April conversations as "the May contract". This terminology confuses the real issue. There was no "contract" either in March or in April. This is a case of promissory estoppel. The March and April conversations were not contracts; they constituted promises. The essential and vital requisite to cause them to ripen into a contract was the acquisition by Quimby of all of the stock of Randall Motors. This was the primary condition demanded by Chrysler in March and reiterated in April. The subsequent conditions were developments of the primary condition. There were no two separate contracts. There was one contract which came into existence when Quimby acted on the promises, and the error in the instruction was the selection of April instead of May as the effective date. This was brought about by the confusion between Quimby's option to buy Mrs. Randall's stock and his actual purchase.
In brief Chrysler urges that it has not had its day in court on the effect of the subsequent conditions imposed by Neely in April. This argument is elaborated with a quotation from Quimby's request for instructions, by reference to the court's charge, and by reference to Quimby's brief on appeal.
In our opinion the sufficient answer to all these arguments is that the case was not in fact tried within the narrow limits that Chrysler now asserts to have been set at the trial. Regardless of the emphasis of counsel and the Court on the so-called "March contract" (i. e. the April date), the fact is that all the terms of the so-called "May contract" (i. e. the successive promises of Chrysler) were expressly alleged in the complaint and were fully given in evidence at the trial. Paragraphs 3, 4 and 5 of the complaint set forth the successive promises of Chrysler. Chrysler had full notice of them. The testimony covered, without objection, both the March conversations and the April conversations. Both Quimby and Neely testified with respect to them. In its charge to the jury the trial court clearly stated the contentions of the parties with respect to all these conversations.
Quimby's whole case was fairly made on the complaint and put before the jury. Chrysler's contention to the contrary we cannot follow.
In the light of these facts, the error in instructions, of which Chrysler seeks to make so much, was little more than an error in fixing the date when the promises ripened into a contract. We may be permitted to doubt whether, at the end of this long trial, which fully developed all the factual issues, the error in the date played any substantial part in the jury's findings.
We think that the verdict of the jury must be taken as a clear finding that Neely did give to Quimby the various assurances testified to, and that Quimby did, upon the faith of these assurances, acquire all the stock of Randall Motors. The evidence on *139 behalf of Quimby was ample to sustain this finding.
Chrysler suggests that Chrysler on retrial of the whole case would contend that the additional conditions imposed by Neely in April, 1951, for a renewal of the license agreement were never performed by Quimby, and that a partial new trial would deprive Chrysler of the opportunity to make such a contention.
The answer to this is that Chrysler, as above stated, has already had its day in court upon these contentions. As to the first additional contention it is admitted that Quimby did not comply with it; Walper was not satisfactory to Chrysler, as was clearly proved. As to the second condition  that Quimby would sell 51% of his stock to one of three persons to be named by Chrysler  it is clear that Chrysler prevented performance, because it never gave Quimby the three names. This was not denied, because Chrysler's case was that the promise to designate the three men was never made.
We fail to see what contention Chrysler could make on a retrial that it did not make in the trial already had, or what additional evidence it could adduce. To award a retrial of the issue of breach of contract would simply give Chrysler a second chance on this issue with another jury.
A brief reference should be made to the very great number of reported decisions on the question of ordering a partial retrial. Connecticut Importing Co. v. Janowitz, 128 Conn. 433, 23 A.2d 514, involved an erroneous charge on the legality of the contract sued upon. Hawley v. Revolta, 131 Conn. 540, 41 A.2d 104, was a case of personal injuries. In such cases a partial new trial is often refused, since it is common knowledge that verdicts in such cases may be the result of a compromise on the issue of liability. See, for example, Sayegh v. Davis, 46 R.I. 375, 128 A. 573; Parizo v. Wilson, 101 Vt. 514, 144 A. 856; Ziervogel v. Royal Packing Co., Mo.App., 225 S.W.2d 798.
Indeed, a reading of many of the decisions refusing a partial retrial on the issue of damages suggests that the guiding principle in reaching a decision is the determination of whether the jury, in awarding damages, has been or may be influenced by the circumstances giving rise to the liability. We cannot see how that danger can exist here. As above stated, this is a suit for breach of contract, and the damages are strictly limited by principles of law. Quimby is entitled first, to loss of profits for 90 days, and second, to any diminution in the asset value of his stock attributable to the breach. Both items must be proved with reasonable certainty. To guard against any unduly large verdict on either item, we suggest that the trial court give consideration to submitting interrogatories directed specifically to these two items.
Finally, Chrysler criticizes as harsh our ruling that Rule 51 of the Superior Court was applicable to its contention on appeal respecting the erroneous instruction. We do not agree. The court's attention was never called specifically to the error. Chrysler prayer (21) simply raised the question of lack of consideration  failure to show change of position. On the motion for a new trial Chrysler contended that the verdict was contrary to the evidence, because no contract had resulted in April. The very purpose of Rule 51 is to abolish the old practice of general exceptions to the charge, on the basis of which counsel for the defeated litigant could examine the instructions at his leisure, after verdict, and take advantage of any slips of the trial judge in submitting to the jury the contentions and legal principles growing out of the case. This practice was manifestly unfair.
We have given careful consideration to the question whether there is any reasonable probability that injustice will result to Chrysler from ordering a partial new trial. We think not. This was a keenly contested jury trial lasting two weeks. The transcript of the testimony and proceedings *140 at the trial contains more than 1000 typewritten pages. We think that the issue of liability was fairly resolved against the defendant, and that it is not entitled to a new trial on that issue.
The cause is remanded to the Superior Court of New Castle County, with instructions to vacate that portion of the verdict and judgment fixing the amount of damages, and to award a new trial upon the issue of damages only.