383 A.2d 640 (1978)
MASSEY-FERGUSON, INC., a Maryland Corporation, and Thos. Best & Sons, Inc., a Delaware Corporation, Defendants below, Appellants,
v.
James C. WELLS, Jr., and Hilda I. Wells, his wife, and Kenneth L. Reed and June S. Reed, his wife, Plaintiffs below, Appellees.
Supreme Court of Delaware.
Submitted September 16, 1977.
Decided January 26, 1978.
Alfred M. Isaacs and James W. Semple, of Flanzer & Isaacs, Wilmington, Richard Allen Paul and Paul M. Lukoff, of Paul, Lukoff & Hurley, Wilmington, for defendant-appellant Massey-Ferguson, Inc.
Ben T. Castle and Richard A. Zappa, of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant-appellant Thos. Best & Sons, Inc.
James M. Tunnell, Jr., Walter L. Pepperman, II, and George Pazuniak, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Julius Komissaroff, of Berg, Komissaroff & Sawyer, Wilmington, for plaintiffs-appellees.
Before HERRMANN, C. J., DUFFY, J., and BROWN, Vice Chancellor.
*641 PER CURIAM:
This is an appeal in a products liability and negligence case against Massey-Ferguson, Inc. (Massey) and Thos. Best & Sons, Inc. (Best) arising from personal injuries sustained by plaintiffs, James C. Wells, Jr. (Wells) and Kenneth L. Reed (Reed).

I
Stated as narrowly as possible, it appears that Wells and Reed were helping Best employees service or repair a large farming machine known generally as a "combine." They were kneeling on the ground under the combine and pushing forward on a grain pan with their hands when the "header," weighing some four thousand pounds, fell on them. Each sustained serious injuries. The combine had been manufactured by Massey and sold by Best. The header had been supported by a safety stand made by Massey as an integral part of the machine. Hydraulic hoses through which the header was raised and lowered and which, according to the evidence, kept it in a raised position and thus acted as a "back-up" safety device, had been disconnected by Best employees in the course of the work.
After a lengthy trial, the jury found, on special interrogations, that both defendants were negligent and awarded damages to Reed; however, it could not decide whether Wells assumed the risk of injury by having placed himself in a dangerous position. The Trial Court granted partial new trials on the issue of Wells' assumption of risk and as to damages for each plaintiff. Defendants then docketed this appeal.
The parties disagree as to what issues the notice of appeal presents to the Court, *642 whether there was reversible error in the jury's findings of negligence, whether the Trial Court properly denied motions for judgment notwithstanding the verdict, and whether that Court abused its discretion in ordering partial new trials.

II
We must first consider what is before us, that is, what issues are properly subject to review by this Court.
The notice of appeal filed by defendants reads as follows:
"PLEASE TAKE NOTICE that both defendants below, Massey-Ferguson, Inc. and Thos. Best & Sons, Inc., appellants herein, hereby appeal jointly and severally to the Supreme Court of the State of Delaware from the decision of the Superior Court of the State of Delaware in and for Sussex County dated October 7, 1976 granting plaintiffs a partial new trial on certain limited issues only."
Defendants contend that the appeal filed is from the entire decision by the Trial Court, including all findings on the merits, while plaintiffs contend that the appeal is from the grant of a partial new trial only.
Defendants have attempted to settle the controversy as to the scope of the appeal by moving to amend the notice. However, under settled law a notice of appeal cannot be amended or modified after expiration of the time for perfecting the appeal, Trowell v. Diamond Supply Co., Del.Supr., 91 A.2d 797, 801-02 (1952). It follows, therefore, that the motion must be denied.
But the notice as filed is ambiguous and we conclude that, in justice, it should be given a broad reading under the circumstances of this case. So viewed, we determine that the notice of appeal raises all issues on the merits. We say this because the appeal was taken "from the decision of the Superior Court ... dated October 7, 1976" and that decision included rulings not only as to partial new trials but also as to "various post-trial motions," many of which the Trial Judge discussed in some detail, including Wells' alleged assumption of risk, the damage claims of the Reeds and Massey's renewed request for judgment NOV. The Court's "Summary" of its rulings implicitly included a denial of any post-trial motion not granted.

III
Turning now to the merits, Massey contends that the finding of liability was reversible error. We disagree.
Massey argues, first, that the jury's finding of negligence was against the weight of the evidence because plaintiffs failed to present evidence of a standard of care or duty applicable under the facts of the case, and thus failed to prove that defendants owed a legal duty to plaintiffs. Although it is true that there was no evidence of industry-wide standards, that is not fatal to plaintiffs' cause.
Plaintiffs' burden was to establish that Massey failed to exercise the care of a reasonably prudent manufacturer under all the circumstances. Restatement (Second) of Torts §§ 395, 398.[1] While this standard of conduct may be established by evidence of industry-wide standards, such evidence is neither controlling nor always necessary. See Delmarva Power & Light v. Stout, Del. Supr., 380 A.2d 1365 (1977). We hold that *643 it is not essential under the facts of the instant case.
We do not mean to suggest that the duty required in a case involving complex technical matters can be determined solely as a matter of a jury's common knowledge. But we are satisfied, however, that the technical evidence offered in this case by the parties' witnesses was such that, under proper instructions from the Trial Court, the jury could correctly apply negligence concepts without resorting to mere speculation.[2]
Nor do we agree with Massey's contention that the weight of the evidence *644 shows negligence to lie entirely with Best. Thus, for example, the jury could have found that Massey failed to provide adequate warnings that use of the safety stand device alone was not sufficient support to maintain the header in an up-raised position;[3] or that Massey negligently invited a user to rely on the safety stand system alone when going under the head.[4]
In light of the foregoing, we hold that there was sufficient evidence of liability and that the Trial Court properly denied the motions for judgment notwithstanding the verdict and for a new trial.

IV
Finally, it is contended that the Trial Court erred in granting partial new trials on the issues of assumption of risk and damages.
The Trial Judge determined that "the jury's partial verdict here has established... [defendants'] negligence for purposes of gauging plaintiff's conduct" and that the question of Wells' assumption of risk can and "must be retried as the only liability determination." The Court also determined that an inadequate verdict had been awarded Reed, which was not the result of a compromise and which therefore did not preclude a partial new trial on damages.
The Trial Judge's rulings must be measured against the standards announced in Chrysler Corp. v. Quimby, Del.Supr., 144 A.2d 123 (1958), wherein this Court held that:
"... the modern rule is well-settled that a new trial may be had upon limited issues when such issues are severable from the other issues, and no injustice will result from retaining the verdict upon those other issues."
Id. at 136. And the issue on appeal from the grant of partial new trials is whether the Trial Court abused its discretion. Trowell v. Diamond Supply Co., supra.
Since it was not unreasonable to have determined that the issues of damages and assumption of risk were severable from the liability issue, or to have determined that it would not result in injustice to retain the verdict upon defendants' negligence, we conclude that the grant of a partial new *645 trial did not result in an abuse of discretion. Best argues that our recent ruling in Delaware Olds, Inc. v. Dixon, Del.Supr., 367 A.2d 178 (1976), calls for invocation here of the "may have been" part of the rule, that is, that the modest verdict for the Reeds should be read as an indication of the jury's difficulty with the assumption of risk defense. But the facts make the case and, implicitly, the Trial Judge determined that the jury had made perceptive distinctions in its findings as to liability and we find no abuse of discretion in such a conclusion. In so ruling, we do not determine what evidence Best or any other party may offer on the Wells' assumption of risk issue or any unsettled allocation of fault issue which has not been settled by the law of the case.
Affirmed.
NOTES
[1] The Restatement (Second) of Torts states:

"§ 395....
A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.
. . . . .
§ 398.
A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."
[2] For example, in reference to the existence of three sets of holes in the safety stand which might invite user error in placing the one pin involved, Mark Keith Byrnes, Chief Project Engineer in the harvesting division of the Massey engineering department, testified as follows:

"Q Is there any reason why Massey-Ferguson could not have put a decal on one of these safety latches saying, be sure to put the pin in the lowest possible hole, or words to that effect? You could have done that, couldn't you?
A Yes.
Q Could you rather easily have provided plastic plugs or some other kind of plugs to fill up the holes that would not be needed unless a man was going to change sizes of cylinders and pistons?
A It is possible to supply  it would be perhaps possible to supply something like that if they would stay in and if they would not  if the customers would not move them from one set of holes to the other ones and were not using them."
And in reference to the width of the safety stand and its relationship to the amount of bearing area coming into contact with the cylinder wall, Byrnes testified as follows:
"Q ... This thing would be a lot better, a lot safer on the smallest sized cylinder if it weren't so broad, wouldn't it, and if it had a narrower curve, a smaller radius to the curve, it would be better than it is, wouldn't it?
A It would fit the cylinder better, yes.
Q You're not saying it would be better, but you do say it would fit the cylinder better?
A Yes.
Q And if it fit the cylinder better, it would be a better safety stop, wouldn't it?
A It would provide a higher degree of safety.
Q It would provide a higher degree of safety; is that what you said?
A Yes."
Furthermore, in reference to the so-called "binding effect" at one end of the safety stand (which caused upward pressure on it such that the safety stop portion of the stand did not come into complete contact with the cylinder portion), Byrnes testified as follows:
"Q ... I asked you this time if such binding was intended?
A No.
Q So that wherever this occurred, it was an error of design, right; or was it manufacturing?
A It could be either design or manufacturing. It could be a tolerance build-up or it could be a small amount of manufacturing fault."
Byrnes' testimony later consisted of the following:
"Q All right. Will you concede that Massey-Ferguson bears some responsibility for that binding condition, forgetting what happened afterwards?
A The binding condition is some fault of Massey-Ferguson.
Q Shouldn't be there, should it?
A I don't believe it should be.
Q When you drew the blueprints for this and figured it out, you did not intend that there would be any such binding condition, did you?
A No, we did not expect the lug to come that far underneath the other end."
And Best's expert, Ernest J. Merz, testified as follows:
"Q As an expert in the field of accident reconstruction and mechanical engineering, have you formed an opinion as to whether the Massey-Ferguson safety stop assembly which was on the Isaacs machine on the day of the accident was defectively designed for use as a safety device?
A Yes.
Q And what is your opinion?
A My opinion is that it was defective.
Q Would you explain your opinion?
A The stop, first of all, was designed without positive means for locking into position. In other words, the safety pin, although it was present underneath the piston, was not intended to carry a load between the pin and the piston, and, in fact, it was of such a configuration and location that it would have been damaging to the piston if it had.
Without the safety pin, the load between the safety stop and the end of the cylinder was carried by friction, and I feel that this use of friction is entirely unacceptable on a safety device.
. . . . .
Q Could the design of this safety stop have been modified back in whenever it was created, back in 1973 or so, with a positive locking feature, from your review of the Massey-Ferguson designs?
A Yes.
Q Would you demonstrate to the jury, if you can, what type of positive locking features you're talking about?
A Yes. This is an alternate design of a safety stop which could have been put on the same device.
. . . . .
Q Okay, this is one version. Are there any other types of locking features that this particular design could have been modified with?
A Yes. I'd like to talk about number three here, the lower half of the sheet primarily.
. . . . .
Q Would such a positive locking device have prevented this accident?
A Yes...."
[3] Myron Durham, Massey's "troubleshooter," testified as follows:

"Q Where anywhere is there anything in writing, published by Massey-Ferguson, to the effect that the hydraulic hoses serve as a safety device?"
MR. ISAACS: "You mean in those words?"
MR. PEPPERMAN:
"In those words."
MR. TUNNELL:
"Q Where do you know of the hydraulic hoses being denoted to be a safety device?
A It is not designated that way; it is not designated as a safety device."
And Byrnes testified:
"Q And in what writing produced by Massey-Ferguson is there anything to the effect that the safety stop was a back-up system and that the hydraulic system was the primary safety support system?
A I do not know of any writing; ..."
[4] The principal of defendant Best, Alfred G. Best, testified:

"Q . . .
Now, underneath it says, `Use safety latch before working under header'.
A Yes.
What does that mean to you about working under the header? That's a pretty simple sentence, and it's a dumb question.
A Everytime any customer we ever delivered a machine to, we point this out and explain this safety latch, to make sure it's in the position before going underneath the header for any reason whatsoever.
Q Now, who supplied that decal?
A Massey-Ferguson."