[No. 35975.   Department Two.   July 18, 1963.]

FRANKLIN MCGARVEY, *Appellant*, v. THE CITY OF SEATTLE, *Respondent.**

*Reported in 384 P. (2d) 127.

*Orvin H. Messegee*, for appellant.

*A. C. Van Soelen, John A. Logan*, and *Robert Ward Freedman*, for respondent.

DONWORTH, J.—On June 1, 1959, appellant, Franklin Mc-Garvey, 80 years of age, seriously fractured both legs and sustained other injuries when he fell into an open manhole in a sidewalk in downtown Seattle.

This action was instituted by appellant against the city of Seattle. At the trial, the evidence was in direct conflict concerning the presence or absence of a barricade around this open manhole at the time of appellant's accident. The jury was instructed by the trial court that if there was a barricade around this open manhole, the plaintiff could not recover. They were further instructed that, if there was no barricade, the city was negligent, and their verdict should be for the plaintiff, unless the plaintiff was contributorily negligent. The jury found for the city.

Mr. McGarvey had suffered from glaucoma for the last 15 years. However, he testified that, at the time of his accident, he had no difficulty in seeing street lights, in seeing the curb going off and the curb coming up, that he could see at least 100 feet ahead, and that he never hurried. The trial court instructed the jury as to the right of a person suffering from impaired eyesight to use the street, and his duty of care in so doing.[1]

The manhole into which appellant fell was located in the sidewalk on the north side of Stewart Street, between Second and Third Avenues. The accident occurred during the afternoon at approximately 3:30 p.m.

---

[1]The trial judge gave the following instruction, No. 4: "A person suffering from impaired eyesight has the same right to use the street as others. Such person, however, is required to exercise that degree of care for his own safety which ordinarily careful and prudent persons suffering from an identical disability would use under the same circumstances.

"If plaintiff in this case failed to exercise such degree of care, and such failure was also a proximate cause of his injury, then he cannot recover."

A city light crew had arrived that morning to repair underground equipment. The testimony on behalf of the city was that, during the time the work was in progress, a warning barricade was erected around the hole. The barricade was made of aluminum, had three hinged sides, which made a "fence" about 4 feet high, and was equipped with red flags. A ladder was placed in the hole and protruded a little over two rungs above the sidewalk level. The barricade and ladder were alleged to be in place except during the lunch period and morning and afternoon coffee breaks, at which times they were replaced by the cover. A truck containing materials used by the repair crew was parked at the curb near the manhole.

The crew consisted of a cable splicer and helper who worked down in the manhole, and a "top" man, who worked on sidewalk level whose duty was to watch the hole and wait on the men below. If the top man had to enter the truck and leave the hole unwatched for more than a few moments (the top man on duty said 10 seconds and another witness said 2 or 3 minutes), it was his duty to call the helper to come to the top and guard the hole.

Appellant has presented five assignments of error for our consideration. We shall first discuss assignment of error No. 2:

"The court erred in withdrawing from the jury's consideration the question of wanton misconduct and in refusing to charge the jury thereon with the proposed instructions hereinafter set out on page 11."[2]

---

[2] Appellant requested the following instructions: *"Instruction No. 1.* You are instructed that the defendant is liable for any injuries to the plaintiff if said injuries proximately resulted from the wanton misconduct of defendant's employee occurring during the scope and course of his employment.

*"Instruction No. 2.* Wanton misconduct is the intentional doing of an act, or intentional failure to do an act, in reckless disregard of the consequences, and under such surrounding circumstances and conditions that a reasonable man would know or have reason to know that such conduct would, in a high degree of probability, result in substantial harm to another. Since wanton misconduct does not arise out of negligence, the contributory negligence of a plaintiff is no defense to an action based upon wanton misconduct."

Appellant's position succinctly stated is this:

"The evidence in this case most favorable to the appellant warranted the court's submitting to the jury the question of wanton misconduct."

The only question is whether there was a prima facie case of wanton misconduct to take the issue thereof to the jury.

Appellant's first witness was a Mrs. Sheldon. She testified that she passed the open hole a few minutes before the accident and that there was no barrier present. After the accident, she observed the appellant being raised from the hole, but she did not see the accident itself. Mrs. Sheldon testified as follows:

"And when I got between Second—Second and Third on Stewart, why, about the middle of the block there was a—I saw a manhole there. And I didn't see any cover over it or any railing around it. And I went up close to the building and sort of walked around and had to go in the alleyway a little bit."

Mr. McGarvey testified that on his way downtown he had observed the barricade in place, but that it was not in place when he returned, and that, if it had been there, he would have seen it.

There was evidence from which the jury could find that the barricade was not in place when appellant fell into the hole. It was admitted that the top man was not at the hole at the time of the accident. The city contends that this can support only a finding of negligence and not wanton misconduct.

In *Adkisson v. Seattle*, 42 Wn. (2d) 676, 687, 258 P. (2d) 461 (1953), we defined wanton misconduct as follows:

"Wanton misconduct is not negligence, since it involves intent rather than inadvertence, and is positive rather than negative. It is the intentional doing of an act, or intentional failure to do an act, in reckless disregard of the consequences, and under such surrounding circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another."

This was quoted with approval in *Greetan v. Solomon*, 47 Wn. (2d) 354, 287 P. (2d) 721 (1955). See, also, *Bidlake v. Youell, Inc.*, 51 Wn. (2d) 59, 315 P. (2d) 644 (1957).

In presenting the defense, the following questions and answers took place between counsel for the city and Mr. Scouller, the top man stationed at the sidewalk level. (References to a barricade are to an exhibit which was alleged to be of the same type used at the scene of the accident.):

" . . . All right, after the noon hour was that barrier put back in the position it is now? A. Yes. Q. How long did it remain so? A. Until two-thirty. Q. Then what happened? A. Then it was coffee time. Q. Coffee time. Then at coffee time what did you do? A. We lowered the ladder down the hole and pulled the lid over the hole. And then closed the fence and leaned it up against the truck. Q. When did you return from coffee? A. At a quarter to three. Q. The barrier was put in place again? A. Yes. Q. What are your duties as a top man; do you remain all of the time immediately adjacent to that barrier, or have you other duties? A. Yes, I have other duties. I have to hop in and out of the truck all day long getting materials for the men below. Q. What are the men below doing? A. They are splicing cable. Q. You said that you had a truck; now, where was the truck parked? A. The truck, the truck was parked just a little,—well, let's see. Do you want the true directions? Q. Well, approximately. A. It's a little east of the hole and a little south of the hole, pointed, headed—it's a one-way street north, or I mean a one-way street westbound. Q. I see. Now, from the time that this barrier was replaced at approximately quarter to three, was it ever touched—strike that. How close were you to that barrier from a quarter to three, say, until three-thirty? A. Not within probably twelve feet. Q. Twelve feet, and what was the maximum distance that you went away—strike that. Where were you when you were twelve feet away? A. Inside the truck. Q. Along the curb. A. Ya. Q. Did you have this barrier continually under your observation either by ear or by sight? A. Yes. Q. Mr. Scouller, what happened around three-thirty? A. Well, I was standing in the truck getting some tape out of cupboards, and I heard this crash. Q. Just describe this crash."

Mr. Scouller then described the crash, stated he jumped out of the truck and found the barricade on the pavement.

The above testimony indicates that the top man was not within 12 feet of the hole for 45 minutes but was inside the truck. Just how observing the manhole *by ear* could have enabled Mr. Scouller to protect pedestrians was not explained. He later testified that he was within the truck for only 10 seconds and that he had looked down the street before entering the truck. Later still, when asked how long he was in the truck, he merely said: "It wasn't very long."

On cross-examination, Mr. Scouller was questioned in regard to his duty to guard the hole:

"Q. And it's true that you have to be around the frame to keep older people and infirm people out of the hole, is that not true? A. Yes. Q. To warn blind people to stay away, is that not true? A. Yes."

And, later in the cross-examination:

"It is true, isn't it, Mr. Scouller, that there is nothing in your work that is as important as keeping your eye on that hole and keeping people out of it? A. That's true. Q. It's true, is it not, that thing right there won't do it by itself? A. That is partially true. Q. Now, Mr Scouller, it's a fact, isn't it, that if you were in the area on the day that Mr. McGarvey fell, that you were away from the top of that hole for more than ten seconds? A. Was I away from the truck more than ten seconds? Q. Away from the top of the hole more than ten seconds. A. No. Q. Then it's your testimony that at no time do you leave the top of that hole for more than ten seconds; is that a fair statement? A. No, that isn't a fair statement. Q. All right. Then, how long do you leave the hole? A. Well, when it gets to be any longer than that, we call a man out of the hole. Q. So at any time that you are going to leave it for any longer than ten seconds, you call another man up? A. Yes."

On recross-examination:

"Q. Did you get someone else to guard the hole on the day that Mr. McGarvey fell when you left? A. No."

Mr. Hubbard, supervisor of the underground distribution system for the city of Seattle testified as to the instructions given to the top men:

"A. Well, the standard practice and in the standard instructions to the top man is, of course, that he assists the helper in opening the hole, placing the barricade, and see-

ing that the proper flags are placed on the barricades. And sometimes when we're in the street to see that the proper traffic cones are placed so as to divert traffic. And then after that is done, the ladder is placed in the hole. Then it is his duty to wait on the men below, get the equipment, and constantly as much as possible see that nothing happens up there, that nobody runs into it, and there doesn't—it doesn't get into somebody's way; in other words, guard the hole. We call them a guard."

Mr. F. John Albi, safety supervisor for Seattle City Light for 32 years, testified to the instruction given to the personnel on safety:

"Q. Do you address these safety meetings? A. Yes. I do. I don't—Q. Are top men present? A. Yes. The safety meetings are composed of all of the personnel in the underground division, of all other divisions. Q. How often are these safety meetings held? A. They are held every month regularly, approximately on the same day of the month at eight o'clock; one hour. Q. What are your instructions? A. Our instructions have been in the past we have discussed this particular problem; and that is that under all circumstances the, the minute a manhole is open, that barricade and flags must be erected."

We have quoted rather extensively from the record to show what Mr. Scouller, the top man, considered as his responsibility in regard to protecting the public from falling into the open manhole, what his superiors considered the duties of top men to be, and what instructions had been given him officially with respect thereto.

The trial court stated:

"I will rule as a matter of law that the evidence will not justify any instructions on wanton misconduct and allow an exception."

■ We believe that, in so ruling, the trial court was in error. The jury might well find from the evidence that the barricade was in place, or even if they found that it was not in place, they might have found (if the issue had been submitted to them) that there was no wanton misconduct. On the contrary, the jury might have found that the cover to the manhole was removed, that no barricade was in place at the time of the accident, and that the hole

was left unguarded by the "top" man. If so, the necessary conclusion would be that the city left an open manhole 3 feet in diameter in a downtown public sidewalk, without even a warning barricade.

We conclude that there is in this record evidence of conduct or misconduct on the part of the city's employees creating a highly dangerous condition to users of the sidewalk. There is further evidence from which the jury could have found that the city's employees knew, or should have known, that such conduct would, in a high degree of probability, result in substantial harm to another, and was thus done in reckless disregard of its probable consequences. Under *Adkisson v. Seattle, supra,* such conduct could be held to be wanton misconduct.

■■ Respondent strenuously argues that the testimony of its witnesses strongly indicates that the barricade was in place at the time of the accident and that appellant walked into it causing it to collapse. It is not our function to weigh the evidence. This is the function of the jury. Either party to an action has the right to have his theory of the case presented to the jury when he requests instructions embodying such theory and there is substantial evidence to support it.

■ Respondent, in support of the judgment, urges that the instructions given on negligence and contributory negligence are the law of the case. These instructions may be the law of the case in regard to negligence and contributory negligence, but they have nothing to do with the law of the case governing the issue of wanton misconduct. There were no instructions given on this theory at all, although such instructions were requested by appellant and the court's refusal to give them was duly excepted to.

It is argued by appellant that a new trial is necessary on both the issues of wanton misconduct and negligence. We do not agree.

Appellant assigns error to the exclusion of rebuttal testimony of a Mr. Berger, a city employee, that he did not hear the fall of a barricade at the time of the accident. This

testimony was allegedly offered to rebut the testimony of another city employee working with Mr. Berger, who testified that he had heard the clatter of a barricade. The court ruled that such testimony was not proper rebuttal. Without determining the correctness of this ruling, it is clear from the record that the testimony of Mr. Berger was not actually excluded.

Counsel for plaintiff had asked the witness: "You did not hear a gate fall, did you?" to which the witness answered: "No, I did not." The answer was not stricken nor was the jury directed to disregard it. This assignment of error is thus without merit.

█ The court gave an instruction on the degree of care required to be exercised by a person with impaired eyesight. This instruction is set out in footnote 1, *supra*. Appellant assigns error to the failure of the trial court to give a requested instruction as to the corollary degree of care to be exercised by the city for the protection of persons with such infirmities, as set out in *Fletcher v. Aberdeen*, 54 Wn. (2d) 174, 180, 338 P. (2d) 743 (1959):

". . . The city, on the other hand, is obliged to afford that degree of protection which would bring to the notice of the person so afflicted the danger to be encountered. . . ."[3]

While the requested instruction might have been proper, its exclusion was not prejudicial. Appellant testified that he could see at least 100 feet ahead, that he had seen many barricades such as the city alleged to have been in place over the manhole, that he knew that they signified danger, and that if the barricade had been in place he would have seen it.

█ Closely related to the assignment of error that has just been discussed, is assignment of error No. 4. Appellant argues that the testimony of respondent's witnesses that there was a barricade *which collapsed,* brought before the jury a question of the sufficiency of the barricade.

---

[3] In this same case, at page 179, we also stated: "The city is charged with knowledge that its streets will be used by those who are physically infirm as well as those in perfect physical condition. . . ."

The contention here made is that a barricade, in order to give pedestrians proper protection, should have been a physical obstruction rather than just a device to give them notice. Appellant assigns error to the failure of the trial court to submit this question to the jury. However, appellant did not submit an instruction on this theory. Having failed to request such an instruction, appellant cannot predicate error on its omission. *Gerberg v. Crosby,* 52 Wn. (2d) 792, 329 P. (2d) 184 (1958); *Atkins v. Churchill,* 30 Wn. (2d) 859, 194 P. (2d) 364 (1948).

It should be pointed out that the counsel who represented appellant at the trial and on this appeal are not the same. The record indicates that the issue of the sufficiency of the barricade was never really in dispute at the trial. The issue was whether there was or was not a barricade present, and not its sufficiency. As mentioned in the first part of this opinion, the trial court instructed the jury, as a matter of law, that the plaintiff could not recover if there was a barricade, and that, if there was no barricade, the verdict should be for the plaintiff unless he was contributorily negligent.[4] No exception was taken to this instruction. It is contended on appeal that there was such an exception taken; however, the record does not disclose it.

The judgment is affirmed on the issue of negligence; the judgment is reversed on the issue of wanton misconduct, and a new trial is granted on that issue only. The costs of this appeal shall abide the final result of the action as provided in Rule on Appeal 55. It is so ordered.

OTT, C. J., FINLEY, WEAVER, and HAMILTON, JJ., concur.

---

[4]The trial court gave the following instruction, No. 3:

"Where, under undisputed facts, the law allows only one conclusion, then it is the duty of the court to instruct the jury as to the conclusion that must be reached.

"I instruct you that if you find that at the time of this occurrence defendant's Exhibit 9 or the equivalent was in place around the open manhole, then the plaintiff cannot recover, and you should bring in your verdict for the defendant.

"I further instruct you that if the manhole was open and Exhibit 9 was not around the manhole at the time of this occurrence, then the city was negligent, and your verdict should be for the plaintiff unless you find that the plaintiff was contributorily negligent."