[No. 51009-1.   En Banc.   February 4, 1988.]

FARM CROP ENERGY, INC., *Respondent,* v. OLD NATIONAL BANK OF WASHINGTON, *Petitioner.*

*Witherspoon, Kelley, Davenport & Toole, P.S.*, by *Jeffrey L. Supinger* and *John E. Heath, Jr.*, for petitioner.

*Ries & Kenison*, by *Harry E. Ries* and *Gerald J. Moberg*, for respondent.

BRACHTENBACH, J.—This case involves conditional promises, recovery of lost profits from a nonexistent business, sufficiency of the evidence as to those lost profits, and promissory estoppel.

Petitioner Old National Bank (ONB) challenges a Court of Appeals decision affirming a $295,000 jury verdict in favor of Farm Crop Energy, Inc. *See Farm Crop Energy,*

*Inc. v. Old Nat'l Bank,* 38 Wn. App. 50, 685 P.2d 1097 (1984). We granted discretionary review, reverse, and remand for new trial.

In 1980, 10 investors incorporated Farm Crop to build a fuel alcohol plant in Royal City, Washington. The investors envisioned a plant that would produce 1 million gallons of fuel–grade alcohol per year from grain screenings readily available as a byproduct of wheat harvesting. The investors planned to sell on the open market the fuel produced. Farm Crop contacted ONB to discuss financing for the project.

In December 1980, Farm Crop submitted a plant feasibility study to an ONB commercial lending officer, Dan Danelo. Although Danelo expressed interest in the project, ONB initially rejected Farm Crop's loan request because the company hired by Farm Crop to construct the plant, Alcohol Equipment Corporation, had never built a fuel alcohol plant.

Subsequently, ONB agreed to reconsider Farm Crop's loan application if Farm Crop could find a company that had built an operating fuel alcohol plant to build the one proposed by Farm Crop. Farm Crop soon reached a tentative agreement with Matrix Energy Company to have Matrix build the plant. Farm Crop president Hugo Van Binsbergen introduced Danelo to Paul Petersen of Matrix. Although Matrix had been only recently formed, Petersen had built fuel alcohol plant similar to the one proposed by Farm Crop.

Upon reconsideration, ONB approved Farm Crop's loan application. On February 19, 1981, ONB issued a commitment letter in which it agreed to lend Farm Crop $1,475,000 subject to certain terms and conditions. Among other conditions, ONB required personal guaranties from Farm Crop investors, some limited and some unlimited. ONB also required Farm Crop to obtain a $500,000 guaranty from the Small Business Administration (SBA) as a condition of the loan.

The SBA agreed to provide the necessary guaranty if Farm Crop could satisfy certain additional conditions,

including unlimited personal guaranties by all Farm Crop investors. The SBA also required Farm Crop to execute contracts both to purchase grain screenings and to sell the alcohol produced by the plant in its first operating year.

From February through May 1981, Danelo and Farm Crop worked together to satisfy the loan conditions imposed by ONB and the SBA. At one point, when the SBA required Farm Crop investors to provide cash and collateral for the loan, Danelo approved of one investor's plan to pay an increased amount of cash in return for another investor's pledge of increased collateral.

In May 1981, Matrix told the Farm Crop investors that Farm Crop could realize substantial tax savings and take advantage of favorable discounts by immediately advancing $175,000 to Matrix for construction costs. Farm Crop investors met with Danelo on May 28, 1981, to discuss the proposal by Matrix. Several investors testified at trial that Danelo assured them that the ONB loan would go through. Another investor testified that Danelo reminded the investors that ONB would fund the loan only if Farm Crop satisfied the conditions. Danelo testified that he reminded the investors of the ONB and SBA conditions and left the decision whether to advance the money to Matrix solely to the Farm Crop investors.

The next day, Farm Crop advanced $175,000 to Matrix. Several investors testified that the advance was made based on Danelo's assurance that ONB would fund the loan.

Danelo testified that on June 3, 1981, he learned for the first time that Farm Crop could not obtain a contract to purchase grain screenings as required by the SBA for its guaranty without a $500,000 letter of credit. Danelo further testified that on June 9, 1981, he was told that three Farm Crop investors refused to sign unlimited guaranties. One of the investors later testified he was reluctant to sign, but ultimately would have signed. Another investor testified that he refused to sign on the basis of Danelo's agreement to allow him to give additional cash in lieu of collateral, which another investor promised to pledge in his stead.

On June 10, 1981 ONB revoked its loan commitment, contending that Farm Crop had failed to comply with the requisite conditions. In October 1981, Farm Crop filed suit against ONB alleging breach of contract and promissory estoppel. After trial, the jury returned a general verdict in favor of Farm Crop for $295,000. The trial court denied ONB's motion for new trial. ONB appealed; the Court of Appeals affirmed. We granted discretionary review. ONB's petition raises two issues: (1) did the trial court err in allowing the jury to consider lost profits? and (2) did the trial court err in failing to instruct on the effect of a conditional noncontractual promise?

I

ONB challenges the trial court's instructions allowing the jury to consider lost profits as part of its damage award. See instruction 11, Clerk's Papers, at 126. ONB contends that in an action for promissory estoppel, damages awardable should be limited to those incurred in reliance on the alleged promise, here the $175,000 advanced by Farm Crop to Matrix. Alternatively, ONB argues that even if lost profits can be recovered in promissory estoppel cases, here the trial court erred in submitting the issue of lost profits to the jury because there was lacking substantial and sufficient evidence upon which a jury verdict as to anticipated profits could be based. Because we agree that under the facts of this case the issue of lost profits should not have been presented to the jury on any theory, we do not address the question whether lost profits are recoverable in promissory estoppel cases generally.

In *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 16, 390 P.2d 677, 396 P.2d 879, 32 A.L.R. 125 (1964), this court stated:

The usual method of proving lost profits is from profit history. It is argued that where a plaintiff is conducting a new business with labor, manufacturing and marketing costs unknown, prospective profits cannot be awarded. This is the so-called new business rule and has long been the law of Washington. *Engstrom v. Merriam*, 25 Wash.

73, 64 Pac. 914 [(1901)]; *Webster v. Beau,* 77 Wash. 444, 137 Pac. 1013 [(1914)]; *Andreopulos v. Peresteredes,* 95 Wash. 282, 163 Pac. 770 [(1917)]; *Lockit Cap Co. v. Globe Mfg. Co.,* 158 Wash. 183, 290 Pac. 813 [(1930)]; *Hole v. Unity Petroleum Corp.,* 15 Wn. (2d) 416, 131 P. (2d) 150 [(1942)]; *Ingersol v. Seattle–First Nat. Bank,* 63 Wn. (2d) 354, 387 P. (2d) 538 [(1963)].

In *Larsen,* the court noted that the new business rule should not bar recovery of lost profits when a reasonable estimation of damages can be made through analysis of market conditions and a profit showing of identical or similar businesses in the vicinity, operating under substantially the same conditions. *Larsen,* at 17. The court concluded that expert testimony could alone form a sufficient basis for an award of lost profits. *Larsen,* at 17, 19. The court cautioned, however, that

> Although expert testimony is a sufficient basis for an award of lost profits, their [sic] opinions must be based upon tangible evidence rather than upon speculation and hypothetical situations. *Bogart v. Pitchless Lbr. Co.,* [72 Wash. 417, 130 Pac. 490 (1913)] *supra.* Consequently, our judicial concern is limited to the question: Was there a substantial and sufficient factual basis upon which the respective opinions could be based? *Warner v. Channell Chemical Co.,* 121 Wash. 237, 208 Pac. 1104 [(1922)].

*Larsen,* at 19.

We note that the proposed fuel alcohol plant from which the anticipated profits were to flow was not built. None of the officers or investors in Farm Crop had built or operated a similar plant. Farm Crop relied solely on expert testimony at trial to substantiate its claim for lost profits. The expert was Paul Christensen, president of Matrix Energy Company, the company hired by Farm Crop to build the plant. Our analysis here focuses on the question whether Farm Crop's expert's testimony was based upon substantial and sufficient facts to support an award of lost profits instruction.

Prior to forming Matrix, Christensen worked as a bank loan officer and raised venture capital; both activities were

unrelated to the industry in question. He had been in charge of purchasing and traffic for an unrelated enterprise.

In his words, Christensen "did a lot of study and work on alcohol." He subscribed to two trade journals, one of which was untitled. Verbatim Report of Proceedings, at 722–23. As to whether this was a profitable industry, he said, "I'm sure that it's been a profitable operation . . . or else they [three existing plants] wouldn't still be in existence producing the alcohol." Verbatim Report of Proceedings, at 733.

The only other plant Christensen was involved with had been shut down just before trial and was expected to be down for a couple of months. He was familiar with five other Northwest plants, four of which were operating. One was operated with wood pulp as its raw material, not grain screenings as proposed here, another operated with brewer's waste, and the others were either shut down or he did not know their status.

Christensen testified in generalities, without dollar amounts or percentages, as to construction and operation costs. Additionally, he made certain assumptions about time and costs of construction, expenses of production, and sales. He assumed an annual output of 1 million gallons. No Northwest plant of which he was aware had ever produced such amount in a year. As to the raw materials being available for the full year, he stated, "as far as supply, I wasn't totally familiar with the suppliability. . . . I would assume there was [an] adequate supply." Verbatim Report of Proceedings, at 784.

Christensen not only predicted profits for the first year's operation from this nonexistent plant, he speculated about future profits thereafter. His candor is revealing: "Oh. Yes, I *suspect* they would continue earning those profits." (Italics ours.) Further, "you have several variable factors that go in there which are fairly hard to predict." Verbatim Report of Proceedings, at 823.

The witness based all of his anticipated profit projections, a pro forma analysis, upon production of 1 million

gallons in the first year. He made no analysis of predicted profits at a lesser rate of production.

Q. So what you are testifying here today is that if everything works right, and we get a million gallons; then this is what your opinion is?

A. That's correct.

Q. And . . . making a pro–forma is nothing [other] than an uneducated judgment?

A. That is correct.

Q. . . . You can't say this plant ran one year, and this is what its cost[s] were, and this is what it produced?

A. Right.

Verbatim Report of Proceedings, at 844–45.

Christensen's projected profit figure of $738,500 did not take into account $400,000 in debt service. Also, while he projected a production of 75 gallons per ton of raw material, his actual experience was that only 30 gallons per ton were produced.

Other relevant testimony by Christensen bears directly upon the main issue.

Q. First of all, all of these numbers are not based on experience in an actual existing plant producing one million gallons of alcohol; are they?

A. Give me your question again. Let me think of that.

Q. This number, net profit before taxes, you can't point me to a single plant and say that's what this plant earned last year; can you?

A. No. Because I don't have those records available to me. There are plants out there producing a million gallons.

Q. You don't know what their profitability is?

A. Yes, that is correct.

Q. You don't know if they are debt fixed or if they are fixed by capital investments.

A. Right.

Q. Now, you see we are trying to stretch things out in the future; and he has asked you if you subtract this, you should get $336,390. Again you haven't made any projection as to what it would have been. Instead of a million, we write 750,000; have you?

A. No, I haven't.

Q. So in order for anyone to believe that this figure is

correct, they have to believe that this plant would have turned out a million gallons?

A. That's correct.

Q. It didn't turn out a million gallons, and that figure is incorrect.

A. Correct.

Verbatim Report of Proceedings, at 902–03.

To summarize, the opinion as to anticipated profits came from a former bank employee who had no technical knowledge of ethanol plants. He based his entire projection of profits upon a plant producing 1 million gallons in its first year of operation. He knew of no plant in the three northwestern states that had such a production record. He knew nothing of their profitability. The only plant with which he was associated had never produced that level. In fact, it was shut down after being plagued with numerous production problems, all of which he assumed would be solved in the plaintiff's unbuilt plant. He never calculated profits based upon a production less than his *assumed* 1 million gallons. He candidly admitted that his pro forma estimate of future profits was "*an uneducated judgment.*"

Applying the *Larsen* test, we conclude that here there was no substantial and sufficient basis upon which Christensen based his "expert" testimony regarding Farm Crop's lost profits. Here, the jury was not presented with evidence based on market conditions and profit showings of identical similar business in the vicinity, operating under substantially the same conditions. *See Larsen,* at 17. None of the criteria identified in *Larsen* as justifying a departure from the new business rule are present here. Christensen's testimony here did not depart from the realm of uncertainty and speculation so as to support an award of lost profits. *See Larsen,* at 17.

We hold that the new business rule bars recovery of lost profits here under either a contract or promissory estoppel theory. The trial court erred in submitting the issue of lost profits to the jury.

## II

Next, ONB argues that the trial court erred by failing to instruct on the effect of a conditional promise as the basis for a promissory estoppel award. Here, the trial court's instructions could have allowed damages based either upon ONB's breach of its written loan commitment, or damages based upon a theory of promissory estoppel arising from Danelo's May assurance, or a combination of both theories. Under instruction 8, the jury could find ONB liable for revoking its loan to Farm Crop if (1) it found that Farm Crop complied with, or was in the process of complying with, the loan conditions within the time allowed for compliance, or if (2) the jury found that ONB had waived or was estopped from asserting Farm Crop's noncompliance with the loan conditions. See instruction 8, Clerk's Papers, at 123. If the jury found that ONB had breached its loan commitment under this instruction, the jury would not need to resort to promissory estoppel for its award. On the other hand, if the jury found that ONB had not breached its commitment because Farm Crop failed to satisfy the conditions, then the jury should not have awarded Farm Crop any damages based on the loan commitment. However, even if the jury found that Farm Crop failed to perform the conditions and thus that ONB was not liable for its revocation of the loan, the jury could still find that Farm Crop changed position in reliance on the May assurance and award damages pursuant to a promissory estoppel theory.[1] As noted by the Court of Appeals below, "the letter of loan commitment cannot be the basis of promissory

---

[1]Instruction 9 provides: "If you find that Old National Bank made a promise which it reasonably expected to cause Farm Crop Energy, Inc. to justifiably change its position, and which promise did cause Farm Crop Energy, Inc. to justifiably change its position, then the Old National Bank is liable to Farm Crop Energy, Inc. for all damages reasonably caused by the promise made and relied upon." Clerk's Papers, at 124.

We note that a preferable instruction would have been based on Restatement (Second) of Contracts § 90(1) (1981):

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce

estoppel." *Farm Crop Energy,* at 53.

Nevertheless, ONB argues that Danelo's May assurance was also conditional and that the court should have instructed the jury pursuant to Restatement (Second) of Contracts § 91 (1981) which reads:

> If a promise within the terms of §§ 82–90 [enforceable but not supported by consideration] is in terms conditional or performable at a future time the promisor is bound thereby, but performance becomes due only upon the occurrence of the condition or upon the arrival of the specified time.

*See also Corbit v. J.I. Case Co.,* 70 Wn.2d 522, 424 P.2d 290 (1967).

Here, Danelo testified that he told Farm Crop investors at the May meeting that he did not want to make any decision for them and that in order to get the loan Farm Crop still had to meet the conditions of the written loan commitment. Verbatim Report of Proceedings, at 1078. One Farm Crop investor backed up Danelo's version:

Q. . . . I understood you to say that Mr. Danelo told you that commitments had to be met?
A. I am sure he stated that to—several times to me.
Q. You have to meet the conditions before you go ahead . . . go ahead but you have to meet the conditions?
A. Right.

Verbatim Report of Proceedings, at 254.

Farm Crop does not dispute that ONB produced evidence of the conditional nature of the May assurance. Instead, Farm Crop contends that the court's instructions as a whole were sufficient as given.

Instructions are sufficient if they permit each party to argue his theory of the case, are not misleading, and when read as a whole, properly inform the trier of fact of the applicable law. *Crossen v. Skagit Cy.,* 100 Wn.2d 355, 360, 669 P.2d 1244 (1983). Here, because of the trial court's

---

such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

failure to instruct the jury on the effect of a conditional noncontractual promise, ONB was unable to argue its theory that because the conditions were not satisfied so as to create a binding contract under the written loan commitment, they similarly were not satisfied so as to create liability under Farm Crop's promissory estoppel theory based on Danelo's May assurance. Moreover, when read as a whole, the instructions did not make clear that the conditional nature of the loan commitment as set forth in instruction 8 (breach of contract instruction) also could have affected the promissory estoppel promise set forth in instruction 9. Thus, the trial court failed to inform the jury of the applicable law.

We conclude that ONB was entitled to an instruction on the effect of a conditional noncontractual promise as stated in Restatement (Second) of Contracts § 91 (1981).

The decision of the Court of Appeals is reversed insofar as it is inconsistent with our determination of the issues raised by the petition. The case is remanded to the trial court for a new trial.

PEARSON, C.J., and UTTER, DOLLIVER, ANDERSEN, and GOODLOE, JJ., concur.

CALLOW, J. (dissenting)—To comprehend the understanding between the parties and the developing atmosphere in which the arrangements took place, it is necessary to recount some of the circumstances omitted by the majority.

The commitment letter issued by Old National Bank (ONB) in February 1981 which was the initial framework of the relationship read:

> The Old National Bank of Washington is pleased to offer to Farm Crop Energy Corporation a loan in the amount of $1,475,000 subject to the following terms and conditions:
> 1. Interest on the principal balance of the loan will be charged at the bank's prime rate plus 2¼ %.
> 2. The loan will have a seven–year amortization.

Monthly interest payments only will be required for the first six months. Principal and interest payments will commence in the seventh month.

3. Our loan is conditioned to Farm Crop Energy's securing a building contract with a company that has built a plant with a one–million gallon production capacity.

4. Advances will be made on the loan according to the following schedule:

25% upon signing of the construction contract

25% when ⅓ of the construction is completed

25% when ⅔ of the construction is completed

25% when the plant is producing 2.2 gallons of alcohol per bushel of corn at 200 proof for 10 consecutive days.

5. Unlimited personal guaranties will be provided by the following individuals and their spouses:

Hugo Van Binsbergen William Rexius
Norman Stakkeland Ronald Mickle
Frank Mainecki Kermit Pollock
Abner Haugen

Personal guaranties limited to 10% of the indebtedness of Farm Crop Energy will be provided by the following individuals and their spouses:

Merle Locke
Bernard Bone
Les Wilson

6. A completion and performance bond will be secured by the contractor.

7. The bank will be provided with evidence of adequate hazard insurance to cover the loss of the building, plant and equipment along with evidence of adequate business interruption insurance to service debt.

8. No dividends will be issued until all debt to the Old National Bank of Washington has been repaid in full. If declared, dividends will be limited to a 20% R.O.E. for the first two years.

9. Withdrawals from the business will be allowed for the income tax liability of the business related income.

10. Expansion will not be permitted without the written consent of the bank.

11. The bank will take a security interest in all equipment owned or to be purchased by Farm Crop Energy. A Deed of Trust will be executed by the corporation cover-

ing the land and plant. Title insurance will be required. The collateral documents for this loan will be prepared by the bank in accordance with federal and state laws as well as bank regulations covering the perfection of these types of collateral.

12. Audited financial statements will be required annually. Unaudited quarterly financial statements will be supplied to the bank.

The above listed terms and conditions of the proposed loan are contingent upon an SBA guaranty of $500,000. These terms and conditions will be set forth in a term loan agreement to be signed by both Farm Crop Energy and the Old National Bank of Washington.

We are pleased to provide these credit accommodations to Farm Crop Energy and look forward to a productive relationship during the coming year.

The Small Business Administration (SBA) imposed additional conditions, including unlimited personal guaranties on the part of all investors. The SBA also required that Farm Crop Energy negotiate and execute contracts to purchase grain screenings and to sell the alcohol to be produced in the plant's first year of operation.

From February through May 1981, ONB commercial loan officer Dan Danelo and Farm Crop Energy worked on satisfying the conditions imposed. When the SBA required the investors to pledge both cash and collateral, Danelo approved of one investor's plan to pay an increased amount of cash in return for another investor's pledge of increased collateral.

In May of 1981, Matrix Energy Company, the firm that was to construct the plant, informed the investors that substantial tax savings and favorable discounts could be realized if Farm Crop Energy could immediately advance $175,000 toward the cost of construction. Several investors testified that in late May Danelo assured them that the loan would go through and that, based on his assurance, Farm Crop Energy advanced $175,000 to Matrix. Hugo Van Binsbergen, president of Farm Crop Energy, testified as follows:

A. [Van Binsbergen] We advanced some funds for the specific reason that we could, like I said, save ourself

quite a bit of money, and also that they could get started on the plant.

Q. Did I hear you say that you talked to Mr. Danelo about that?

A. Yes, I did.

Q. What was the purpose in talking to Mr. Danelo about that?

A. To be sure that we were to get the balance of the money to come up with when our next payment was due and that the money was assured.

. . .

Q. What did he say?

A. He said, go ahead, we've got a few papers to sign, but everything is great, go ahead.

Another witness testified that:

In essence, Mr. Danelo stated that there would be no problems with the loan, that the documents that needed to be signed should take place within the next few days, but we had to wait for a title report on the land that was to be put up as security, and it would take approximately three and a half weeks.

However, as noted by the majority, Danelo and one investor testified that Danelo reminded the investors that the loan would go through only if the investors met the loan conditions. Suffice it to say that the testimony was conflicting and the evidence is in the records to support the verdict of the jury.

The Farm Crop Energy investors did advance $175,000 to Matrix on May 29, 1981. Danelo testified that on June 3 he learned for the first time that Farm Crop Energy could not obtain a grain screenings contract without a $500,000 letter of credit. Danelo also testified that on June 9 he was told that three investors, Mainecki, Pollock and Wilson, refused to sign guaranties of unlimited credit. Of the three investors, Pollock testified that he was reluctant to sign in light of his earlier agreement with Danelo, but that he ultimately would have signed; Mainecki testified that he refused to sign because of his earlier agreement with Danelo; and Wilson was not at trial to testify.

On June 10, 1981, ONB revoked its loan commitment, alleging that Farm Crop Energy had failed to comply with

conditions. In October, Farm Crop Energy sued ONB for breach of contract. At trial, the court instructed the jury on both contract and promissory estoppel theories.[2] The court also gave a general instruction on damages.[3]

All issues raised on appeal by ONB challenge asserted

---

[2]The jury was instructed on the contract and estoppel aspects of the case as follows:

"Instruction No. 8

"The bank's written loan commitment is a written contract which obligates the bank to loan money to the plaintiff, Farm Crop Energy, in accordance with the terms and conditions of the commitment. If you find that Farm Crop Energy complied with, or was in the process of complying with all of the conditions of the loan commitment, within the time allowed for compliance, and that the defendant, Old National Bank, refused to honor its commitment, then your verdict should be for the plaintiff, Farm Crop Energy, and against the defendant, Old National Bank, for such damages as you determine were proximately caused by the bank's failure to honor its commitment.

"If on the other hand, you find that the plaintiff, Farm Crop Energy, failed to meet or could not meet any condition of the loan commitment within the time allowed for compliance, then your verdict should be for the defendant, Old National Bank, unless you find that compliance with any such condition was waived by the Bank or that the Bank is estopped from asserting non–compliance with any such condition.

"'Waiver' is the intentional and voluntary relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right. It may result from an express agreement or be inferred from circumstances indicating an intent to waive.

"'Estoppel' means that a party is precluded by his own acts from asserting a right to the detriment of another who, entitled to rely on such conduct, has acted thereon.

"A party asserting waiver and/or estoppel has the duty to prove the existence of any such waiver and/or estoppel by a preponderance of the evidence.

"Instruction No. 9

"If you find that Old National Bank made a promise which it reasonably expected to cause Farm Crop Energy, Inc. to change its position, and which promise did cause Farm Crop Energy, Inc. to justifiably change its position, then the Old National Bank is liable to Farm Crop Energy, Inc. for all damages reasonably caused by the promise made and relied upon.

"Instruction No. 10

"If one of the parties to a contract repudiates his willingness to perform a contract prior to the time his performance is due, either through a refusal to perform the conditions of the contract, or by putting it out of his power to perform, the other party's performance of the contract is excused and that party's failure to perform the contract is not a breach of that contract."

[3]To instruct the jury on damages the court said:

errors or inadequacies in the instructions. No challenge was raised to the qualifications of experts or to the adequacy of the evidence to prove damages, yet the majority dwells upon these settled aspects of the appeal.

ONB argues that the trial court erred when it failed to instruct the jury that lost profits are not recoverable on a theory of promissory estoppel. Promissory estoppel is a basis for an action for damages. *See, e.g., Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 259, 616 P.2d 644 (1980) (citing Restatement of Contracts § 90 (1932)). Restatement of Contracts § 90 sets out five prerequisites to recovery on a promissory estoppel theory: "(1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise." *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967).

This court has not ruled on whether lost profits are recoverable in a promissory estoppel case. It is ONB's position that the damages recoverable should be limited to those necessary to restore the plaintiff to the position it would have been in had it not acted in reliance on the promise. *See, e.g., Fretz Constr. Co. v. Southern Nat'l Bank*, 626 S.W.2d 478, 483 (Tex. 1981); *see also Goodman v. Dicker*, 169 F.2d 684 (D.C. Cir. 1948). On the other hand, other courts have refused to distinguish the damages recoverable under promissory estoppel and contract. *See Signal Hill Aviation Co. v. Stroppe*, 96 Cal. App. 3d 627, 158 Cal. Rptr. 178 (1979).

Most courts had adopted the approach of section 90 of

---

". . . If your verdict is for the plaintiff, then you must determine the amount of money which will reasonably compensate the plaintiff for its damages proximately caused by defendant's wrongful conduct.

"In that regard you should consider the following elements of damage:

"(1) The amount, if any, expended by the plaintiff in anticipation of receiving the loan;

"(2) The amount, if any, of lost profits incurred by the plaintiff.

"The burden of proving damages rests with the plaintiff . . ." Instruction 11.

the Restatement of Contracts. The Oregon Court of Appeals set forth the flexible position of courts as follows:

> The remedy [for promissory estoppel] is not co-extensive with that for breach of contract. The remedy may be limited as justice requires.

*Bixler v. First Nat'l Bank,* 49 Or. App. 195, 199 n.4, 619 P.2d 895 (1980). *See also Kramer v. Alpine Vly. Resort, Inc.,* 108 Wis. 2d 417, 321 N.W.2d 293 (1982); *Ehret Co. v. Eaton, Yale & Towne, Inc.,* 523 F.2d 280 (7th Cir. 1975); *Hoffman v. Red Owl Stores, Inc.,* 26 Wis. 2d 683, 133 N.W.2d 267 (1965); *Chrysler Corp. v. Quimby,* 51 Del. 264, 144 A.2d 123, 885 (1958).

Promissory estoppel as defined by section 90 of the Restatement of Contracts is accepted in Washington law. *Spooner v. Reserve Life Ins. Co.,* 47 Wn.2d 454, 287 P.2d 735 (1955). When a promisee has relied to his detriment upon a promise which the promisor should have foreseen would be relied upon, the measure of damages can be the same as in a contract supported by consideration. The damages, in appropriate situations, should be such as to place the promisee in as good a position as that which would have been occupied had the promisor performed. Restatement of Contracts § 329, comment *a* (1932); Note, *Promissory Estoppel—Measure of Damages,* 13 Vand. L. Rev. 705, 709 (1960); Metzger & Phillips, *The Emergence of Promissory Estoppel as an Independent Theory of Recovery,* 35 Rutgers L. Rev. 472 (1982–83). When an action takes place in reliance upon a promise which satisfies the requirements of the doctrine of promissory estoppel, the reliance of the promisee creates a contract and damages may be awarded for the loss that directly results from the breach. *Chrysler Corp. v. Quimby,* 51 Del. 264, 283–84, 144 A.2d 123, 885 (1958). Under this approach reliance has been looked upon as a substitute for consideration and a contract measure of damages is available to the injured promisee if such damages are justified by the circumstances. *Once More Into the Breach: Promissory Estoppel and Traditional Damage Doctrine,* 37 U. Chi. L. Rev. 559 (1969–70); 13 Vand. L. Rev. 705, *supra.*

We should approve the flexible rule enunciated by the Restatement and described by the *Bixler* court. A promisee in some circumstances should be allowed to recover the benefit of the bargain on a promissory estoppel theory. The trial court's instructions were not erroneous because they failed to limit damages recoverable on promissory estoppel to reliance damages.

However, the differences between contract and promissory estoppel theories should be emphasized. A preferable instruction on promissory estoppel would be based on section 90 of Restatement (Second), which reads:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90(1) (1981).

The jury verdict should not be reversed despite the trial court's failure to distinguish clearly between contract and promissory estoppel theories. Alternative instructions on the measure of damages were not proposed. As stated in *Egede–Nissen v. Crystal Mt., Inc.*, 93 Wn.2d 127, 135, 606 P.2d 1214 (1980):

> We recognize that a party is entitled to have the trial court instruct on its theory of the case if there is substantial evidence to support it. This rule applies regardless of the inconsistency of the theories of the parties. *Allen v. Hart*, 32 Wn.2d 173, 176, 201 P.2d 145 (1948); *Heinz v. Blagen Timber Co.*, 71 Wn.2d 728, 732, 431 P.2d 173 (1967). A proponent, however, must provide the court with appropriate forms of instructions correctly stating the law supporting the theory he advocates. CR 51; *McGarvey v. Seattle*, 62 Wn.2d 524, 533, 384 P.2d 127 (1963).

Generally, when an instruction is legally incorrect or not supported by the evidence, a party need only object to preserve the error for appeal. *See* CR 51(f). The rule is different, however, when a party objects to the omission of an instruction.

> There is a distinction between misdirection and nondirection in the giving of instructions. The former may be taken advantage of by a proper exception to the instruction, but to take advantage of the latter, the trial court's attention must be called to the particular matter and a request made for an instruction on it.

*Heitfeld v. Benevolent & Protec. Order of Keglers,* 36 Wn.2d 685, 707, 220 P.2d 655, 18 A.L.R.2d 983 (1950). An appellate court will review the omission of an instruction only if the objecting party proposed the desired instruction to the trial court. "Having failed to request such an instruction, appellant cannot predicate error on its omission." *McGarvey v. Seattle,* 62 Wn.2d 524, 533, 384 P.2d 127 (1963). "Error cannot be predicated on the giving of an instruction which correctly states the law applicable to the evidence but does not embody a given qualification or exception, if no limiting instruction was requested by the complaining party." *State v. O'Connell,* 83 Wn.2d 797, 819, 523 P.2d 872 (1974).

Here, ONB objected to the trial court's failure to limit the damages recoverable in a promissory estoppel case. However, the trial court correctly stated the law applicable to promissory estoppel, and a qualifying instruction was not proposed. In the absence of a limiting instruction advancing its own theory of the damages recoverable under promissory estoppel the bank cannot now complain. Under these circumstances, the court's failure to distinguish between damages recoverable under breach of contract and under promissory estoppel was not reversible error.

More importantly, we should not reverse the jury's general verdict because it is impossible to tell whether it was based on a breach of contract or promissory estoppel theory. Ordinarily a general jury verdict should be upheld where the jury has been instructed on several theories and one of the theories presented is proper. *See, e.g., Sprague v. Sumitomo Forestry,* 104 Wn.2d 751, 709 P.2d 1200 (1985). *See also Barson v. E.R. Squibb & Sons, Inc.,* 682 P.2d 832 (Utah 1984); *Reese v. Cradit,* 12 Ariz. App. 233, 469 P.2d

467 (1970); 89 C.J.S. *Trial* § 503, at 173.

The trial court instructed the jury on both the theories of promissory estoppel and breach of contract. The court also instructed the jury that ONB's loan commitment of February 1981 constituted a written contract. The evidence supports a finding of breach of contract. The jury could have decided that Farm Crop Energy was in the process of complying with the conditions of the loan commitment when ONB decided to revoke its promise on June 10, 1981. For example, Norman Stakkeland, one of the primary organizers of Farm Crop Energy, testified as follows:

Q. As of June 10th, 1981 were you ready, willing and able to comply with all of the conditions of the loan?
A. (Stakkeland) Certainly.

The jury also could have decided that ONB revoked its commitment because bank officers became reluctant to continue and not because of Farm Crop Energy's failure to comply with the loan commitment conditions. As Stakkeland testified:

Well, the one thing that sticks in my mind, I don't remember everything that was talked about in that conversation, but the one thing that does stick in my mind was that his loan officer or whoever he was working with on this loan had read something in the *Newsweek* or the *Wall Street Journal* or something about that the alcohol plants were unfeasible and he was getting nervous or had cold feet about this particular loan.

Finally, the jury could have decided that ONB waived or was estopped from asserting the conditions to the loan because ONB changed those conditions in response to Farm Crop Energy's requests.

When a jury renders its decision by general verdict, the basis of the decision will be known only to the jury itself. Here, special verdict forms requiring the jury to specify (a) the amount of recovery attributable to out–of–pocket losses and lost profits, and (b) whether the bank was liable for breach of contract or promissory estoppel would have clarified the jury's actions.

In addition, ONB argues that even if lost profits are sometimes recoverable in a promissory estoppel case, they should not be recoverable in this case. The Court of Appeals was correct when it stated that "lost profits were appropriate and the trial court properly submitted the issue to the jury." *Farm Crop Energy, Inc. v. Old Nat'l Bank*, 38 Wn. App. 50, 57, 685 P.2d 1097 (1984).

*Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 390 P.2d 677, 396 P.2d 879 (1964) is helpful in the consideration of the problem, but not definitive. *Larsen* deals with the recoverability of lost profits in a contract case, not with whether lost profits may be recovered when liability is based upon promissory estoppel. However, the *Larsen* rationale provides guidance for consideration of the problem common to the two concepts. *Larsen* states in part:

> Are lost profits recoverable? The modern view is that they are properly recoverable as damages when (1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty.
>
> The first rule poses no problem, for it was clearly foreseeable that if the contract was breached there would be lost profits on national sales. Most contracts are motivated by the expectation of future profits. If such profits are within the contemplation of the parties at the time the contract is made, they may form the measure of damage.

(Citations omitted.) *Larsen*, at 15. Continuing, the *Larsen* decision notes the need to prove damages with reasonable certainty and finds that if the plaintiff produces the best evidence available and it is sufficient to afford a reasonable basis for estimating loss, recovery will not be denied. The court further stated:

> The usual method of proving lost profits is from profit history. It is argued that where a plaintiff is conducting a new business with labor, manufacturing and marketing costs unknown, prospective profits cannot be awarded. This is the so-called new business rule and has long been the law of Washington.

*Larsen,* at 16. And the opinion, after setting forth the so-called "new business" rule above, notes that the reasons for the rule vanish when analysis of market conditions and a profit showing of similar businesses operating under substantially the same conditions is made, the court stating:

> The rule is succinctly stated in *Barbier v. Barry,* 345 S. W. (2d) 557, 563 (Tex. Civ. App. 1961), as follows: ". . . lost profits will not be denied merely because a business is new if factual data is available to furnish a basis for computation of probable losses. . . ." Its rationale is stated as follows: ". . . Where the fact is well established that profits would have been made and the difficulty in proving their amount is directly caused by the defendant's breach, a greater liberality is permitted in making estimates and drawing inferences. . . ." 5 Corbin on Contracts § 1023, p. 133.
>
> Respondents point out that a reasonable method of estimation of damages is often made with the aid of opinion evidence. Experts in the area are competent to pass judgment. So long as their opinions afford a reasonable basis for inference, there is departure from the realm of uncertainty and speculation. Expert testimony alone is a sufficient basis for an award for loss of profits.

*Larsen,* at 17. In view of the general verdict rendered by the jury, we do not know whether the jury included lost profits within that award. It might well have decided the case on the basis of a breach of the loan commitment. There was substantial evidence to indicate a breach of the loan commitment and to substantiate lost profits. The evidence of the successes and failures of comparable fuel alcohol plants was conflicting, but there was evidence which the jury could have accepted of the costs of production, expected price and potential output. As noted in *Larsen,* this was sufficient to form a basis for the jury verdict.

In any event, the question of the sufficiency of the evidence as a basis for the jury verdict is not before us. The issues presented for review to this court were limited in scope and did not reopen all of the issues decided by the trial court and the Court of Appeals. The issues as presented to this court were stated as follows:

(1) Should promissory estoppel provide a basis to recover lost profits following defendant's refusal to make a loan where in order to prevail on a promissory estoppel theory, the promisee would have failed to meet express conditions of a written loan commitment and the promise relied upon by the promisee was not based upon the written loan commitment, but a much later oral promise?

(2) Did the trial court err when it refused to instruct the jury that in order for a conditional promise to support promissory estoppel, the promisee must meet all conditions imposed by the promisor, where there was substantial evidence that the purported promise was conditional?

Thus, the issues presented to us do not involve the sufficiency of the y evidence to uphold the jury verdict. RAP 13.4(c)(5) states that the petition for review should contain a concise statement of the issues presented for review. RAP 13.7(b) states that if the Supreme Court accepts review, the court will review "only the questions raised" in the petition for review unless the court orders otherwise upon the granting of the petition.

The issues before us on review were not evidentiary issues or challenges to the sufficiency of the evidence, but challenged the instructions given by the trial court. In spite of this, the majority reverses a general jury verdict when the jury was instructed on several theories and one was appropriate and supported by the evidence.

Finally, ONB argues that when the trial court instructed the jury on promissory estoppel the court also should have instructed the jury on the effect of conditions to a promise that is not supported by consideration. Specifically, ONB argues that the court should have instructed the jury pursuant to section 91 of Restatement (Second), which reads:

If a promise within the terms of §§ 82–90 [enforceable but not supported by consideration] is in terms conditional or performable at a future time the promisor is bound thereby, but performance becomes due only upon the occurrence of the condition or upon the arrival of the specified time.

Restatement (Second) of Contracts § 91 (1981). *See Corbit*

*v. J.I. Case Co.,* 70 Wn.2d 522, 424 P.2d 290 (1967).

ONB produced evidence that it had conditioned all promises, but did not submit an appropriate instruction on the law of conditional promissory estoppel under Restatement § 91. The bank did propose an instruction on conditions to a contract which was not pertinent to the issue before the jury. The issue in this case is the absence of an instruction on conditions to a noncontractual promise. "Error cannot be predicated on the giving of an instruction which correctly states the law applicable to the evidence but does not embody a given qualification or exception, if no limiting instruction was requested by the complaining party." *State v. O'Connell,* 83 Wn.2d 797, 819, 523 P.2d 872 (1974).

We should not reverse the jury verdict because the trial court failed to instruct the jury on two aspects of promissory estoppel. The focus of the proceedings below was on contract theory. The general $295,000 verdict of the jury to Farm Crop Energy can be supported by contract theory. We should not reverse the verdict because of the trial court's failure to give two instructions on promissory estoppel that neither party proposed.

DORE and DURHAM, JJ., concur with CALLOW, J.